1
2
3
4
5
6
7
8           **UNITED STATES DISTRICT COURT**

9           **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  ALAN G. GIMENEZ,                          Civil No.      12-1137 LAB (BLM)

12                          Petitioner,        **REPORT AND RECOMMENDATION
                                               OF UNITED STATES MAGISTRATE
13                                             JUDGE RE: GRANTING MOTION
                    vs.                        TO DISMISS PETITION FOR WRIT
14                                             OF HABEAS CORPUS**

15  J. TIM OCHOA, et al.,

16                          Respondents.

17

18  **I.      INTRODUCTION**

19          On May 28, 1999, Petitioner Alan G. Gimenez, a state prisoner proceeding with

20  counsel, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in this Court.

21  (See Gimenez v. Early, 99cv1133 JM (JFS) (S.D. Cal. 1999), doc. no. 1.)  In that petition, he

22  challenged his April 10, 1992 conviction in San Diego Superior Court case number CR127737

23  for the second degree murder of his infant daughter Priscilla.  (Id.)  This Court denied the

24  petition on October 24, 2003.  (See id., doc. no. 56.)  Gimenez appealed his case to the

25  Ninth Circuit Court of Appeals, which affirmed the denial on May 27, 2005.  (Id., doc. no.

26  65.)

27          Gimenez has now filed in this Court a successive Petition for Writ of Habeas Corpus

28  pursuant to 28 U.S.C. §§ 2244(b) and 2254, and the Ninth Circuit Court of Appeal has

                                        1

granted Gimenez's request for permission to file a such a petition.  (ECF Nos. 1, 4.) Respondent filed a motion to dismiss the petition for failing to meet the standards of 28 U.S.C. § 2244(b)(1) and (2).  (ECF No. 18.)  Respondent also contends the petition is untimely.  (Id.)

The Court has reviewed the petition, the motion to dismiss, Gimenez's opposition to the motion to dismiss, Respondent's reply, the record, and all the lodgments and exhibits submitted by the parties.  For the reasons discussed below, it is recommended that the Motion to Dismiss the Petition be **GRANTED**.

## II.    PROCEDURAL BACKGROUND

Gimenez was convicted of the second degree murder of his six-week-old daughter Priscilla on April 10, 1992.  (Lodgment No. 12, vol. 4 at 997-99.)  He was sentenced to fifteen years-to-life in prison on May 21, 1992.  (Id. at 1019-21.)

Gimenez appealed his conviction to the California Court of Appeal for the Fourth District, which affirmed his conviction on June 15, 1993. (Lodgment No. 16.) Gimenez then filed a Petition for Review in the California Supreme Court on July 19, 1993, which summarily denied it without citation of authority on September 15, 1993.  (Lodgment Nos. 17-18.)

Gimenez filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court on March 21, 1995, which was assigned case number 95cv0352 E (RBB).  In that case, the Court granted Gimenez's motion to withdraw the petition on November 1, 1995, when it became clear he had failed to exhaust his state court remedies.  (See S.D. Cal. case no. 95cv0352 E (RBB), doc. no. 19.)

After exhausting claims in state court, Gimenez filed a second petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this court, which was assigned case number 96cv3457 K (JFS).  (See S.D. Cal. case no. 96cv3457 K (JFS), doc. no 1.)  That petition was denied without prejudice on April 6, 1999.  (See id., doc. no. 41.)

Following another return to state court to exhaust state court remedies, Gimenez filed a third petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court on May 28, 1999.  (See S.D. Cal. case no. 99cv1133 JM (JFS).)  The Court denied the petition on the

12cv1137

merits on October 24, 2003.  (See id., doc. no. 56.)  The district judge also denied a certificate of appealability.  (Id., doc. no. 59.)

Gimenez appealed the Court's denial of the petition to the Ninth Circuit Court of Appeals.  The Ninth Circuit granted a certificate of appealability on the question of whether counsel had rendered ineffective assistance of counsel when he failed to obtain all of the victim's medical records.  (See id., doc. no. 61.)  The Ninth Circuit ultimately upheld the denial of that petition.  (Lodgment No. 24.)

On August 24, 2009, Gimenez began a new round of collateral review in state court by filing a Petition for Writ of Habeas Corpus in the San Diego Superior Court.  (Lodgment No. 3, vol. 2 at Lodgment No. 25.)  The superior court issued an Order to Show Cause, and the San Diego County District Attorney's Office filed a lengthy return and exhibits.  (Lodgment No. 3 at 66-253; Lodgment No. 6.)  In a fourteen-page written opinion, the superior court denied the petition.  (Lodgment No. 1.)

Gimenez then filed a Petition for Writ of Habeas Corpus in the California Court of Appeal.  (Lodgment Nos. 2-4.)  Respondent filed a response and exhibits.  (Lodgment No. 5.)  The appellate court denied the petition on November 21, 2011, adopting the reasoning of the superior court and stating Gimenez did not present a prima facie case for relief.  (Lodgment No. 8.)

Gimenez filed a Petition for Review in the California Supreme Court.  (Lodgment No. 9.)  The California Supreme Court denied the Petition for Review without citation of authority on February 15, 2012.  (Lodgment No. 10.)

On May 9, 2012, Gimenez filed a successive petition in this Court, and on May 11, 2012, he filed an Application for Leave to File a Successive Habeas Corpus Petition under 28 U.S.C. § 2254 in the Ninth Circuit Court of Appeal.  (See ECF No. 1; Lodgment No. 25.)[1]  The Ninth Circuit granted the application on October 18, 2012.  (ECF No. 4.)  Respondent filed

---

[1]  Petitioner filed a Motion for Stay on May 10, 2012, pending the Ninth Circuit's decision on the Application for Leave to File a Successive Petition in order to stop 28 U.S.C. § 2244(d)'s statute of limitations from running.  (ECF No. 2.)  The motion was denied on October 24, 2012, after the Ninth Circuit granted Gimenez permission to file this petition.  (ECF No. 7.)

12cv1137

a motion to dismiss and accompanying lodgments on May 10, 2013.  (ECF No. 18-19.) Gimenez filed an Opposition to the Motion to Dismiss on July 9, 2013.  (ECF No. 26.) Respondent filed a Reply on August 5, 2013.  (ECF No. 30.)

### III.   FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1) (West 2006); see also Parke v. Raley, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness).  Respondent recounts in his Motion to Dismiss the lengthy facts as found by the California Court of Appeal, and thus the Court will not repeat them here.  (See Mem. of P. & A. Supp. Mot. to Dismiss at 9-29, ECF No. 18).[2]  The Court defers to the facts as found by the state court and as recounted by Respondent.

### IV.  DISCUSSION

When a Petitioner seeks permission from the Ninth Circuit Court of Appeals pursuant to 28 U.S.C. § 2244(b)(3)(A) to proceed with a successive petition in the district court, the Ninth Circuit must determine whether he has made a prima facie showing that he has satisfied the requirements of the statute.  The Supreme Court has noted that once a court of appeal has determined a petitioner has made such a showing, which is the case here, "to survive dismissal in district court, the applicant must actually 'sho[w]' that the claim satisfies the standard."  Tyler v. Cain, 533 U.S. 656, 661, n. 3 (2001).  Although the nature of this showing is not specifically defined in the statute or by case law, it is clear it must be more than the "prima facie" showing needed to simply authorize the filing of the successive petition in the district court, and must include a more detailed and searching inquiry.  See Bible v. Schriro, 651 F.3d 1060, 1064, n. 1 (9th Cir. 2011).  The district court is required to

/ / /

---

[2] Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted by the Court's electronic case filing system.

dismiss any claim that does not satisfy the provision.  See 28 U.S.C. § 2244(b)(4).  Section 2244(b) states as follows:

> (1) A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed.
>
> (2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless —
>
> > (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> >
> > (B) (i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
> >
> > (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b) (West 2006).

Gimenez does not allege his claims "rel[y] on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable."  See 28 U.S.C. § 2244(b)(2)(A).  Rather, he seeks to proceed under § 2244(b)(2)(B)(i) and (ii).  Respondent alleges all of Gimenez's ineffective assistance of counsel claims should be dismissed because they are barred by § 2244(b)(1), and his remaining claims do not satisfy § 2244(2)(B)(i) and (ii).

A. The Ineffective Assistance of Counsel Claims (claims 8-15) and Subdivision (b)(1)

Respondent argues all of Gimenez's new ineffective assistance of counsel claims, claims eight through fifteen, are barred by § 2244(b)(1) because they seek to relitigate claims he raised in his prior petition.  (Mem. of P. & A. Supp. Mot. to Dismiss at 37-39, ECF No. 18.)  Respondent notes that in his prior petition, Gimenez claimed trial counsel was ineffective for failing to obtain and use a report by Dr. Lewis from Children's Hospital, failing to obtain all of Priscilla's medical records, in particular Priscilla's lab reports, and by failing to retain and consult with a hematologist who could evaluate the lab reports and render an

opinion as to the cause of her death.  (See Pet. in case no. 99cv1133 JM (JFS) doc. no. 1 at 3-6; Traverse in case no. 99cv1133 JM (JFS), doc. no. 39 at 6-11; Supplemental Traverse in case no. 99cv1133 JM (JFS), doc. no. 42 at 1-2;  Add. Supp. Traverse in case no. 99cv1133 JM (JFS), doc. no. 50 at 1-12.)  In the current petition, Gimenez argues counsel was ineffective for hiring an incompetent pathologist as an expert witness (claim eight), failing to hire a radiologist to interpret Priscilla's x-rays and CT scans (claim nine), calling radiologist Dr. Lee Harvey as an expert witness who testified favorably for the prosecution (claim ten), failing to provide defense expert witness Dr. Tiznado-Garcia with Priscilla's CT scans before trial (claim eleven), failing to secure credible expert witnesses to present an alternative cause of death (claim twelve), failing to subpoena all of Priscilla's medical records (claim thirteen), failing to properly prepare and interview Dr. Kerley, the doctor who delivered Priscilla (claim fourteen), and failing to "meaningfully challenge the prosecution's medical evidence with available favorable forensic evidence" (claim fifteen).  (Pet. at 15-18, ECF No. 1; Mem. of P. & A. Supp. Pet. at 34-57, ECF No. 11.)

As Respondent notes, the Ninth Circuit has held that "a 'ground is successive if the basic thrust or gravaman of the legal claim is the same, regardless of whether the basic claim is supported by new and different legal arguments . . . . Identical grounds may often be proved by different factual allegations . . . .'" Babbit v. Woodford, 177 F.3d 744, 746 (9th Cir. 1999) (quoting United States v. Allen, 157 F.3d 661, 664 (9th Cir. 1998).)  The Ninth Circuit noted the breadth of this prohibition in Cooper v. Brown, 510 F.3d 870 (9th Cir. 2007):

> If Petitioner has previously adjudicated a claim of ineffective assistance of counsel in this Court, his pending claim of ineffective assistance of counsel must be dismissed.  28 U.S.C. § 2244(b).  New factual grounds in support of a legal claim that has already been presented, i.e., ineffective assistance, are not sufficient to evade the mandatory dismissal requirement of 28 U.S.C. § 2244(b).  See Babbitt, 177 F.3d at 746.  Petitioner already complained about his defense trial counsel's performance in a myriad of claims of ineffective assistance of trial counsel in his first habeas corpus petition, Cooper I, 92–CV–427, Suppl. Pet. at 63–147, all of which were denied on the merits by this Court.  Cooper I, 92–CV–427, Aug. 25, 1997 Order at 7–33.  The gravamen of the claim of ineffective assistance of trial counsel is the same,

/ / /

6

1    regardless of whether Petitioner presents new and different legal arguments
2    or different factual allegations.  See Babbitt, 177 F.3d at 746.

3  Cooper, 510 F.3d at 931.

4        In Babbit, petitioner raised an ineffective assistance of counsel claim in his first
5  petition and alleged counsel had failed to sufficiently present a post traumatic stress disorder
6  defense; the Ninth Circuit rejected that argument.  Id.  In support of a new allegation of
7  ineffective assistance of counsel in his successive petition, Babbit alleged trial counsel was
8  ineffective because of his alcohol abuse.  By the time of Babbit's second petition, he had
9  discovered counsel had resigned from the state bar due to his drinking during a trial, and
10 had learned from counsel's legal staff that counsel had drank "three or four drinks" on a
11 "number of occasions" during Babbit's trial.  Id.  The Ninth Circuit concluded the new
12 ineffective assistance of counsel claims contained in Babbit's successive petition were
13 absolutely barred by § 2244(b)(1):

14        Although Babbit asserts new factual explanations for his counsel's
15        ineffectiveness at trial, the gravaman of his legal argument is essentially the
         same.  Because we have already determined that trial counsel's performance
16        during the guilt, sanity and penalty phases was not constitutionally deficient,
         we will not consider new factual grounds in support of the same legal claim
17        that was previously presented.

18 Babbit, 177 F.3d at 764.

19       Accordingly, the Court concludes that Gimenez's ineffective assistance of counsel
20 claims are barred by 28 U.S.C. § 2244(b)(1).  Gimenez raised ineffective assistance of
21 counsel claims in his first petition which was decided on the merits, and the gravaman of the
22 ineffective assistance of counsel claims he currently raises are the same as those claims he
23 previously raised.  Thus, the Court **RECOMMENDS** all of Gimenez's ineffective assistance
24 of counsel claims, claims eight through fifteen, be **DISMISSED** pursuant to 28 U.S.C.
25 § 2244(b)(1).

26 / / /

27 / / /

28 / / /

12cv1137

B.  The Ineffective Assistance of Counsel Claims (claims 8-15) and
Subdivisions (b)(2)(B)(i) and (ii)

In the alternative, if the ineffective assistance of counsel claims are not barred by 28 U.S.C. § 2244(b)(1), they must satisfy the standards set forth in § 2244(b)(2)(B)(i) and (ii). In order to survive dismissal of his ineffective assistance of counsel claims under those provisions, Gimenez must show "the factual predicate for the claim[s] could not have been discovered previously through the exercise of due diligence," and that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  28 U.S.C. § 2244(b)(2)(B)(i)-(ii).

Gimenez has not met the standard outlined in § 2244(b)(2)(B)(i) with regard to his ineffective assistance of counsel claims because he has not shown the factual predicate of those claims could not have been discovered previously through the exercise of due diligence.  In claim eight, Gimenez claims counsel should not have used Dr. Guard as an expert because he could not read the autopsy slides properly, could not date the brain bleed slides, was not familiar with the symptoms of shaken baby syndrome and thus could not properly refute the prosecution's theory, and had been fired from the San Diego County Medical Examiner's Office for incompetence.  (Pet. at 15, ECF No. 1; Mem. of P. & A. Supp. Pet. at 42-43, ECF No. 11.)  All of this information, however, has been available to Gimenez since the 1992 trial in his case.   Indeed, Dr. Guard was cross-examined about these shortcomings during the trial.  (Lodgment 12, vol. 3 at 568-71, 594-96.)

In claim nine, Gimenez argues counsel was ineffective for failing to hire a radiologist to interpret the x-rays and CT scans.  (Pet. at 15, ECF No. 1; Mem. of P. & A. Supp. Pet. at 43-44.)  According to Gimenez, this failure resulted in no witnesses testifying that Priscilla's rib fracture was present at birth, that a "stroke-like clot" was present in Priscilla's brain before she died and was likely the cause of death, and that CT scans alone do not prove a child was the victim of shaken baby syndrome.  (Pet. at 15, ECF No. 1; Mem. of P. & A.

Supp. Pet. at 43-44.)  The record reflects, however, that Dr. Harvey, a radiologist called by the defense, testified that an x-ray taken shortly after Priscilla's birth on June 26 showed a possible rib fracture of the seventh rib, the same rib which appeared to have a healing fracture on August 11.  (Lodgment No. 12, vol. 2 at 441-42.)  Dr. Tiznado-Garcia testified he believed Priscilla died from a sagittal sinus thrombosis, the "stroke-like clot."  (Lodgment No. 12, vol. 4 at 800, 879, 883.)  Dr. Eisele testified that the pattern of injuries — the subdural hematomas, the rib fracture and the retinal hemorrhages — not the CT scans alone, led him to conclude that Priscilla died from shaken baby syndrome.  (Lodgment No. 12, vol. 1 at 109-12, 115-17.)  Dr. Alexander also testified that in his opinion, Priscilla's injuries as a whole, including the subdural hematomas, rib fracture, and retinal hemorrhages, strongly suggested she was victim of shaken baby syndrome.  (Lodgment No. 12, vol. 2 at 338, 353-54, 370.)  In any event, Gimenez has been aware of the alleged failure of counsel to have a radiologist testify to these matters since his trial in 1992.

In apparent contradiction to claim nine, Gimenez contends in claim ten that counsel was ineffective *for calling* a radiologist, Dr. Harvey, because he testified favorably for the prosecution, and because the sole purpose of his direct testimony was simply to establish doctors inaccurately read Priscilla's August 7, 1991 CT scan which showed bleeding in her brain, not to read Priscilla's x-rays or CT scans and render an opinion favorable to the defense.  (Pet. at 16, ECF No. 1; Mem. of P. & A. Supp. Pet. at 44-45.)  Dr. Harvey read Priscilla's bone survey from August 11, 1991, and found no abnormalities, but later corrected his report and concluded the films showed a healing rib fracture about one to two weeks old.  (Lodgment No. 12, vol. 2 at 430-33.)  He also testified he conducted a second review of Priscilla's August 7, 1991 CT scan, which had been read by another physician.  Dr. Harvey concluded that, contrary to the original doctor who read it as normal, the scan revealed fresh blood on the surface of Priscilla's brain.  (Id. at 436-39.)  As noted above, Dr. Harvey also testified an x-ray taken at birth showed a possible rib fracture.  (Id. at 441.)  As Gimenez points out, Dr. Harvey testified the presence of blood around the brain and a healing rib fracture made him concerned Priscilla was a victim of shaken baby syndrome.  (Id. at 443.)

9

This testimony was certainly damaging.  It is clear, however, Gimenez has been aware of this damaging testimony, and counsel's role in presenting Dr. Harvey's testimony to the jury, since his 1992 trial, and he has therefore not satisfied § 2244(b)(2)(B)(1).

Grounds eleven through fifteen are similarly based on factual predicates that have been known to Gimenez since his 1992 trial.  In grounds eleven and fourteen, Gimenez complains counsel did not properly prepare Dr. Tiznado-Garcia or Dr. Kerley for their testimony.  Specifically, he claims counsel did not provide Dr. Tiznado-Garcia with Priscilla's CT scans until trial, whereupon Tiznado-Garcia testified he believed Priscilla's CT scan showed a blood clot which caused her death.  (Pet. at 16-17, ECF No. 1; Mem. of P. & A. Supp. Pet. at 45-46, ECF No. 11.)  On cross-examination, Tiznado-Garcia stated he relied on the radiologist's reading of the CT scan to render his opinion.  (Lodgment No. 12, vol. 4 at 844.)  Gimenez contends if counsel had provided the CT scans to Tiznado-Garcia earlier, the doctor would have told counsel he needed to hire a radiologist to read the scans and testify for the defense.  (Pet. at 16-17, ECF No. 1; Mem. of P. & A. Supp. Pet. at 45-46, ECF No. 11.)

As to Dr. Kerley, Gimenez claims that had counsel properly prepared him for his testimony, Kerley would have reviewed his medical notes and testified Priscilla's birth was not without complications and that Priscilla had "considerable molding" of her head due to being stuck in the birth canal prior to the Cesarean section which could have caused a brain bleed beginning at birth.  (Pet. at 17-18, ECF No. 1; Mem. of P. & A. Supp. Pet. at 48-49, ECF No. 11.)  In ground thirteen, Gimenez argues counsel was ineffective for failing to subpoena all of Priscilla's medical records.  (Pet. at 17, ECF No. 1; Mem. of P. & A. Supp. Pet. at 47-48, ECF No. 11.)  And in grounds twelve and fifteen, Gimenez complains generally that counsel did not present any credible medical evidence to counter the prosecution's case or meaningfully challenge the prosecution's evidence.  (Pet. at 17-18, ECF No. 1; Mem. of P. & A. Supp. Pet. at 46-47, 49-51, ECF No.11.)

These claims all relate to events that occurred at trial; Gimenez has been aware of these alleged shortcomings and alleged instances of ineffective assistance of counsel since

his 1992 trial.  Accordingly, he has not shown he has satisfied § 2244 (b)(2)(B)(i).  The Court therefore **RECOMMENDS** the ineffective assistance of counsel claims, claims eight through fifteen, be **DISMISSED**.

   C. <u>The False Evidence and Actual Innocence Claims (claims 1-7 and 16-26)</u>
   <u>and § 2244(b)(2)(B)(ii)</u>

   In claims one through seven, Gimenez contends his conviction is based on false evidence.  (Pet. at 1-14, ECF No. 1; Mem. of P. & A. Supp. Pet. at 22-33, 58-77, ECF No. 11.)  These claims are based on new evidence Gimenez has submitted which consists of evaluations of the medical evidence in this case by new experts, new opinions by those experts about what the evidence shows, and scholarly medical journal articles questioning the validity of shaken baby syndrome as a mechanism of injury and how shaken baby syndrome, or abusive head trauma as it is now known, is diagnosed.  These new experts have rendered opinions that Priscilla did not die from shaken baby syndrome/abusive head trauma, but rather from a brain hemorrhage that occurred at birth, possibly as a result of being stuck in the birth canal for hours, which continued to bleed and re-bleed over her short life, or a cortical venous thrombosis/saggital sinus thrombosis (referred to at times as a "stroke-like clot").  The new experts also contend new scientific evidence casts doubt on the theory that shaking alone can cause the types of injuries seen in Priscilla, and certainly not without the presence of neck damage.  In addition, the new experts opine the medical evidence establishes Priscilla's retinal hemorrhaging occurred while she was in the hospital in the days before she died and was caused by intercranial pressure from the chronic brain bleed or stroke-like clot, not shaking.  Finally, the new experts contend the rib fracture can be seen on an x-ray taken just after Priscilla's birth and was likely a result of birth trauma during the Cesarean section, not being grasped during a shaking incident.  (See <u>generally</u>, Pet'rs Lodgments, ECF No. 12; Lodgment No. 4, vol. 1-3.)

   These claims satisfy § 2244(b)(2)(B)(i) because they are based on new scientific understanding of the mechanism of injury, methods of diagnosis, and possible over diagnosis, of shaken baby syndrome/abusive head trauma, and thus the factual predicate

for the claims could not have been discovered previously through the exercise of due diligence.  See 28 U.S.C. § 2244(b)(2)(B)(i).  They must also, however, satisfy § 2244(b)(2)(B)(ii), which requires Gimenez to establish the new facts, "if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  28 U.S.C. § 2244(b)(2)(B)(ii).

Respondent contends § 2244(b)(2)(B)(ii) requires Gimenez to show constitutional error occurred at his trial, and that Gimenez's claim of "false evidence" does not state a valid federal legal theory because a due process violation based on false evidence requires that a witness commit perjury at trial.  Because Gimenez has not shown any witness perjured themselves at his trial, Respondent argues he does not satisfy the statute's requirements. (Mem. of P. & A. Supp. Pet. at 39-44, ECF No. 18.)  Gimenez argues neither the statute nor case law sufficiently describe whether a petitioner must establish constitutional error before proceeding to determine whether that error affected the jury's determination of guilt.  (Mem. of P. & A. Supp. Opp. to Mot. to Dismiss at 13-18, ECF No. 26.)  Because the determination of whether constitutional error has occurred is essentially a merits decision and thus inappropriate to decide on a motion to dismiss, Gimenez urges the Court to "accept the defendant's characterization of the error as being unconstitutional and simply . . . evaluate the impact of that error on a reasonable fact finder."  (Id. at 14.)

Gimenez's interpretation, as Respondent points out, would simply eliminate from the statute the requirement that a petitioner show constitutional error was the source of his wrongful conviction, which is the essential basis for federal habeas corpus jurisdiction.  As previously noted, while the standard this Court must apply to evaluate whether Gimenez's claims satisfy § 2244(b)(2)(B) is not entirely clear, the statute does clearly state Gimenez must, at a minimum, allege a constitutional error that occurred at his trial.  As Respondent notes, although the Ninth Circuit has not directly addressed this issue, the Eleventh Circuit

/ / /

/ / /

12

has.  In In re Boshears, 110 F.3d 1538 (11th Cir. 1997), the Court stated the inquiry under § 2244(b)(2)(B)(ii) involved three steps:

> First, we must identify "the facts underlying the [applicant's] claim" and accept them as true for purposes of evaluation the application.  We next must decide whether these facts establish a constitutional error.  Finally, we evaluate these facts in light of the evidence as a whole to determine whether, had the applicant known these facts at the time of his or her trial, the application clearly proves that the applicant could not have been convicted.  In other words, the application must be denied if "any rational trier of fact could have found the elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 [citations omitted] (1979) . . . . This is a very difficult standard to meet.

Boshears, 110 F.3d at 1541; see also Woratzeck v. Stewart, 118 F.3d 648, 653 (9th Cir. 1997) (concluding a petitioner did not meet the § 2244(b)(2)(B)(ii) standard by alleging a conflict of interest with regard to his clemency petition because there is no federal constitutional right to clemency, and thus no constitutional error was stated).

Even the case cited by Gimenez in support of his position finds a petitioner must show constitutional error to satisfy § 2244(b)(2)(B)(ii).  In Quezada v. Smith, 624 F.3d 514 (2nd Cir. 2010), the Second Circuit addressed the showing a petitioner must make to obtain permission to file a successive petition, stating that "[o]nce newly discovered evidence has been presented, the gate-keeping issues are whether Quezada has identified a constitutional error and, if so, whether he has shown by clear and convincing evidence that but for that error no reasonable jury would have found him guilty."  Quezada, 624 F.3d at 521.  Given the plain wording of the statute, and the authorities cited above, the Court concludes that in order to survive a motion to dismiss, Gimenez must show constitutional error occurred.

Gimenez argues the presentation of false evidence states a valid federal constitutional error, and that due process is violated by a conviction which rests on such false evidence.  In every case the Court has reviewed, however, the alleged due process violation was based on a witness's perjury.  See e.g., Dow v. Virga, 729 F.3d 1041 (9th Cir. 2013); Henry v. Ryan, 720 F.3d 1073 (9th Cir. 2013); Gentry v. Sinclair, 705 F.3d 884 (9th Cir. 2013); Jones v. Ryan, 691 F.3d 1093 (9th Cir. 2012); Phillips v. Ornoski, 673 F.3d 1168 (9th Cir. 2012); Quezada, 624 F.3d at 520 (stating the recantation of trial testimony by a prosecution witness

satisfies a petitioner's prima facie burden to show constitutional error under § 2244(b)(2)(B)(ii)); Hayes v. Ayers, 632 F.3d 500, 520 (9th Cir. 2011); Maxwell v. Roe, 628 F.3d 486, 501 (9th Cir. 2010) (noting that "it is undisputed that [the informant] Storch told numerous lies at Maxwell's trial). Gimenez has provided no case, Ninth Circuit or otherwise, which holds due process is violated when testimony, given truthfully at the time, is later determined to be unwittingly false; nor has the Court located any such case. Gimenez has also provided no evidence the medical experts at his trial perjured themselves or lied about their expert opinions in any way.

Even assuming a conviction based on false evidence, as opposed to perjury, is constitutional error, Gimenez has not established the expert testimony presented at his trial was false. He has only established that his new experts interpret the medical evidence differently than the experts at his trial did and that those new experts have different opinions about what the evidence shows. Ground one alleges Dr. Eisele falsely testified the neomembranes on the autopsy slides indicated the subdural bleeding was at most four weeks old and therefore could not have come from a birth injury. He testified as follows:

> A.   Most of [the subdural hematoma] — the vast majority of it was fresh, within a matter of days, certainly less than a week. There were a few small areas where I did see some neomembrane formation, which would indicate to me that there had been something there, probably very small in extent, for a period of time. Again the neomembrane I saw varied from something like two weeks or so, possibly two and a half weeks, down to a week.
>
> . . .
>
> Again, I think most of the hematoma probably occurred around the time she was admitted to the hospital . . . . On the 10th, or about three days before she died. I think there was some injury there, as I say, probably two weeks or so before she died, which would take her back to the last part of July, the first part of August.
>
> There may have been some injury — some additional injury in the interim. Again, with these small microscopic areas it's difficult to tell whether I'm seeing a continuum in time or I'm just seeing incomplete formation of something that may be a little bit older.
>
> . . .
>
> As a chronic subdural, yes, birth injuries can cause subdural hematomas. So if you want to talk about something that occurred six weeks ago, yes, I would

14

include birth injuries . . . .  Once I saw the miscroscopics and realized there was an older hematoma there, I considered it, but my — well, there were two or three things that led me to eliminate it.  One, again, was the fact that the baby was born by c-section or cesarean section, which would make birth injury much less likely.

The second was my aging of the older hematoma, which didn't appear to be anywhere close to six weeks.  As I say, I think I felt two weeks, possibly three weeks, four weeks at the absolute outside.

. . .

The stage of healing that I saw — well, okay.  I did see neomembrane, small areas of neomembranes.  I saw them only with the microscope.  You could not see them with the naked eye.  I felt, one, that the amount of hematoma to the amount of neomembrane was totally disproportionate.  In other words, I'm seeing a few little microscopic threats of membrane and yet I'm seeing a hematoma that covers half the baby's brain.

. . .

So, I felt that the recent hematoma, the one that was about three days old when I did the autopsy, was a result of a new trauma, not rebleeding from a neomembrane.

(Lodgment No. 12, vol. 1 at 108-09, 129-30, 141-42.)

According to Gimenez, his new experts, Drs. Leetsma, Wolfe, and Plunkett, opine the slides show the subdural "bleeding began at or shortly after birth and was chronic."  (Mem. of P. & A. Supp. Pet. at 24, ECF No. 11.)  The new evidence does not establish, however, that Dr. Eisele's testimony was false at the time given or false now.

In his declaration, Dr. Leetsma states that "the oldest component of the subdural hematoma(s) is consistent with an age of a month or so.  The younger components are found in the range of 2 weeks or so from death, to a few days from death, to any period within two days of death."  (Pet'rs Lodgment at 8, ECF No. 12.)  This opinion does not differ in any significant way from Eisele's estimation that the older hematoma was two or three weeks old, "four weeks old at the absolute outside," and that the "vast majority" of the hematoma "was fresh, within a matter of days, certainly less than a week."  Dr. Plunkett states he reviewed the slides from the autopsy, but does not date the subdural hematomas.  (Id. at 29-30.)  He only provides scientific evidence and information about how infant head trauma is currently understood, how the science has changed over the years, other

15

conditions that can mimic infant head trauma and his opinion that "[c]ortical venous thrombosis (CVT), not trauma, caused Priscilla's death." (Id. at 29.)  Dr. Wolfe also does not specifically date the neomembranes, stating only that "[t]he subdural hematomas are 'mixed,' in that they contain fresh blood without neomembranes and also regions with much older neomembranes, stainable iron, and macrophages." (Id. at 38.)  He also states that, in his opinion, the medical evidence supports his conclusion that "the underlying neuropathological process in Priscilla's case is many days or weeks old, and quite likely originated during birth," and that the cause of death was "[p]rimary cerebral venous infarction due to progressive intradural sinus and cortical vein thrombosis." (Id. at 40.)

Thus, the only basis for Gimenez's claim that Eisele's testimony was false is new and different interpretations of the medical evidence and new and different opinions about what that evidence shows by new and different experts.  These differing expert opinions do not establish Dr. Eisele's testimony was false.

Ground two alleges Dr. Eisele falsely testified the "stroke-like clot" found during the autopsy was formed after Priscilla's death, while Gimenez's new experts – Drs. Leetsma, Wolfe, Plunkett and Bonnell – state the clot was formed before death, probably as a result of a cortical venous thrombosis or saggital sinus thrombosis, which caused her death.  (Pet. at 11, ECF No. 1; Mem. of P. & A. Supp. Pet. at 24, ECF No. 11.)  Although there is a notation about the saggital sinus clot being formed postmortem in the autopsy report, Dr. Eisele did not testify about the clot at trial.  (See Lodgment No. 4, vol. 2, Ex. Q at 10; Lodgment No. 12, vol. 1 at 87-165.)  Dr. Leetsma states that, in his opinion, the saggital sinus contained an antemortem clot.  (Pet'rs Lodgments, Ex. A at 9.)  Dr. Plunkett states Priscilla died from a cortical venous thrombosis, as does Dr. Wolfe and Dr. Bonnell.  (Id., Ex. C at 29, Ex. D at 38, 40, Ex. F at 48.)  Dr. Bonnell states the clot is antemortem as well. (Id., Ex. F at 48.)  Another of Gimenez's experts, Dr. Barnes, also believes the CT scans show the cause of death to be something other than infant head trauma, and states the differential diagnoses include "cerebral venous thrombosis, coagulopathy, hypoxia-ischemia, and infection." (Id., Ex. B at 1.)  As with claim one, however, Gimenez has not established

Eisele's testimony was false or perjurious, only that experts disagree on the interpretation of the medical evidence in his case.  Indeed, Dr. Stanley, a Chief Deputy Medical Examiner for the County of San Diego, states in her declaration it is possible the clot was formed both antemortem and postmortem:

> While the portion of the thrombus in the superior saggital sinus examined microscopically by Dr. Eisele appears to have formed postmortem, the sections of sinus submitted for microscopic examination by Dr. Guard show antemortem thrombus, some of which could have begun to form a few days before death.  I believe that this thrombus is secondary to the injuries and is not the primary cause of the brain swelling as I find no description or evidence of venous infarcts.[3]

(Lodgment No. 6, Ex. 3 [Decl. of Dr. Christina Stanley].)[4]

As with the preceding ground, Gimenez seeks to characterize the new medical opinions as "true," and the medical opinions of the trial experts as "false."  The opinions are, however, simply different expert opinions based on the evaluation of the same medical evidence. Gimenez has not shown Dr. Eisele's testimony was false, only that it differs from his current experts.

In ground three, Gimenez claims Dr. Alexander's testimony that Priscilla's retinal hemorrhages were a result of shaken baby syndrome was false.  (Pet. at 12, ECF No. 12; Mem. of P. & A. at 25, ECF No. 11.)  In support, Gimenez cites declarations from Drs. Wolfe, Bonnell, and Cohen, which state the lack of stainable iron on the autopsy slides indicates the injury occurred during Priscilla's ultimate hospitalization and as a result of her cerebral hemorrhaging, not from injuries inflicted by Gimenez.  (Pet. at 12, ECF No. 1; Mem. of P. & A. Supp. Pet. at 35, ECF No. 11.)  Specifically, Dr. Wolfe states they are "recent," Dr. Bonnell states the injury was less than 72 hours old, and Dr. Cohen states they were "two to three

---

[3]  Dr. Whitlock also states in his declaration that he saw a lack of infarction.  (See Pet'rs Lodgments, Ex. E at 2, ECF No. 12.)

[4]  Declarations by Dr. Stanley and Dr. Levin were submitted to the Superior Court by the District Attorney as support for Return to Order to Show Cause.  (See Lodgment No. 5 at 66-253; Lodgment No. 6, Exs. 3-5.)  The state appellate court specifically adopted the reasoning of the state superior court in its denial of Gimenez's habeas corpus petition, and the state supreme court denied the petition without citation of authority.  (See Lodgment Nos. 8, 10.)  Accordingly, the declarations were before the state courts when they decided Gimenez's petitions, and they may be relied upon by this Court as well.  Ylst v. Nunnemaker, 501 U.S. 797, 803, 806 (1991).

12cv1137

days old."[5]  (Pet'rs Lodgments, Exs. D at 3-4, F at 2, G at 3, ECF No. 12.)  In a declaration submitted by the District Attorney in support of their return in state court, however, Dr. Alex Levin states that "[d]ating by hemosiderin [staining] is highly controversial  and very variable." (Lodgment No. 6, Decl. of Dr. Alex Levin at 3.)  The absence of universal or near universal acceptance of a method of dating a retinal hemorrhage necessarily means Dr. Alexander's testimony was not false.  Moreover, Priscilla was in the hospital for 67 hours before she died.  (See Peter's Lodgments, Ex. F at 2.)  According to Gimenez's new experts, the hemorrhages could have been as old as 72 hours, and thus could have occurred while Priscilla was out of the hospital and in Gimenez's care.  In any event, as with Gimenez's preceding claims, his new experts' opinions are simply different than those put forth by the trial experts.

Claim four alleges Dr. Eisele falsely testified Priscilla did not have coagulopathy or a blood clotting disorder.  Gimenez, with support from his new experts, claims the records show Priscilla did have such a disorder, and coagulopathy, not shaking, resulted in her death. (Pet. at 13, ECF No. 1; Mem. of P. & A. Supp. Pet. at 25, ECF No. 11.)  Specifically, Dr. Whitlock and Dr. Bonnell both state Priscilla's medical records indicate she had clotting and coagulation problems.  (Pet'rs Lodgments, Ex. E at 2, Ex. F at 3, ECF No. 12.)  Dr. Whitlock, however, states that while the lab reports indicate coagulation abnormalities, the cause of the coagulation and clotting problems was "uncertain," that there were no other indications of a clotting disorder — such as bruising or internal bleeding other than the subdural hematoma — and that "head trauma, in and of itself may lead to subsequent abnormal coagulation studies, rendering it impossible to determine which of the two findings precedes the other, . . . which appears to be the case in this particular case." (Pet'rs Lodgments, Ex. E at 2, ECF No. 12.)  Gimenez's own expert's uncertainty renders his claim that Dr. Eisele's

/ / /

---

[5]  Dr. Cohen did not look at the autopsy slides, she only reviewed the autopsy report.  (See Pet'rs Lodgments, Ex. G at 1, ECF No. 12.)

　
/ / /

testimony was false without foundation.  Moreover, Dr. Eisele's testimony was essentially in

line with much of Dr. Whitlock's analysis regarding any clotting problems:

> Q.  Doctor, if there were some sort of congenital problem or problem with the coagulation or the clotting of the blood, could that — could a rebleeding from an old injury continue to grow and grow and get as massive as you've described?
>
> A.  Could it?  Yes, it could.  I don't think that's what happened in this case.
>
> Q.  Dr. Eisele, can you tell us what a protein-C deficiency is?
>
> A.  Protein-C is a — it's a component of the blood that affects blood clotting and causes individuals to bleed more easily.  The mechanism is fairly complex.  I think Protein-C, I believe, is an inhibitor of an enzyme that — I'm trying to remember the sequence.  It inhibits an enzyme that takes part in blood coagulation.
>
> Q.  Do you know if Priscilla was tested for Protein-C deficiency?
>
> A.  I don't believe so.  There was no reason to test her.  There was no evidence that she had any bleeding tendency.
>
> Q.  But you felt — you felt there was a reason to test her for, say Leukemia.  What reason did you have to test her for that?
>
> A.  I didn't test her for Leukemia as part of my autopsy.  I ruled it out.
>
> Q.  You considered Leukemia?
>
> A.  I considered it.
>
> Q.  Did you consider Protein-C deficiency?
>
> A.  I considered clotting deficiencies in general.  I did not consider just Protein-C deficiency.  To my knowledge, that cannot be assayed postmortem.  The reason I didn't consider it is there was no evidence of a bleeding tendency.  There was no hemorrhage other than the subdural hematoma.  There was no bruises.  There was no history of bruises.  There was no bleeding into any of the other organs.  There nothing to indicate bleeding into the joints.
>
> Q.  So you ruled that out initially?
>
> A.  So I think on a clinical basis there was not basis to think there was a clotting deficiency.  And again, as part of my autopsy I saw no evidence of a clotting deficiency.  But we did not do the specific chemical tests for Protein-C deficiency or hemophilia or any of the other clotting problems.

(Lodgment No. 12, vol. 1 at 142-43.)

/ / /

Claim five alleges the evidence presented at trial about a healing rib fracture of Priscilla's seventh rib was false.  (Pet. at 14, ECF No. 1; Mem. of P. & A. Supp. Pet. at 25-26, ECF No. 11.)  Gimenez claims the rib fracture was present at birth, and in support provides the declaration of Dr. Barnes, who Gimenez claims viewed more birth x-rays than the prosecution's trial experts.  Dr. Barnes states the rib fracture was present in one of the x-rays taken after Priscilla's birth.  (Pet'rs Lodgments, Ex. B at 1, ECF No. 12.)  At trial, Dr. Sascha Hilton testified the x-rays from Priscilla's August 8 and 11 admission to the hospital show a rib fracture that had been healing for 20 to 30 days.  (Lodgment No. 12, vol. 1 at 234.)  She did not see a fracture in the x-rays taken of Priscilla at birth.  (Id. at 222-23.)  Contrary to Gimenez's claim, however, Dr. Barnes states only that he saw a "possible right seventh rib abnormality, . . . present on the two chest films at birth, although more readily apparent on the very first chest film."  (Pet'rs Lodgments, Ex. B at 1.)  He does not state the rib was fractured, only "possibly abnormal."  This does not establish Dr. Hilton's testimony was false.  It is certainly possible the "abnormality" was present at birth, and that the rib was actually fractured later.

In claim six, Gimenez contends Dr. Eisele falsely testified Priscilla suffered no birth trauma, which supported a later diagnosis of shaken baby syndrome.  (Pet. at 14, ECF No. 1; Mem. of P. & A. Supp. Pet. at 26, ECF No. 11.)  Gimenez contends new evidence shows Priscilla had "extensive coning (molding) of her head during the more than 29 hours of attempted natural birth, . . . and x-rays taken the day of birth show a rib abnormality or injury . . . ."  This supports Gimenez's theory that Priscilla had a rib fracture and brain bleed at birth, the latter of which worsened over time and ultimately led to her death by natural causes.  (Pet. at 14, ECF No. 1; Mem. of P. & A. Supp. Pet. at 26, ECF No. 11.)

As support for his contentions, Gimenez presents medical records he states show Teresa Gimenez was given an emergency C-section when it became clear her labor was not progressing and the baby might have been exposed to infection.  (See Lodgment No. 4, vol. 2 at 6, 7, 19, 37, 39.)  The records also show the baby's head had begun molding due to her

prolonged presence in the birth canal.  (Id. at 37.)  Dr. Kerley, Teresa's physician has also submitted a declaration, in which he states Teresa was in active labor 12 hours (not 29), and "the baby's head was well impacted in the pelvis with considerable molding (skull deformity) which was still evident after delivery." (Pet'rs Lodgments, Ex. I at 2, ECF No. 12.)  Gimenez also submits Dr. Leetsma's declaration, which states that subdural hematomas can occur as a result of the birthing process, and that these may continue to bleed over time and lead to more serious medical conditions and even death.  (Pet'rs Lodgments, Ex. A at 5, ECF No. 12.)

Finally, Gimenez submits medical journal articles supporting his theory of Priscilla's death.  (See Lodgment No. 4, vol. 3, Ex. EE at 5, Ex. NN at 2.)

A trial, Dr. Eisele was asked his opinion as to whether Priscilla's rib fracture and subdural hematoma were birth injuries.  (Lodgment No. 12, vol. 1 at 115.)  He stated he did not believe they were because she was delivered via Cesarean section, and thus would not have had the trauma of being forced through the birth canal; he also stated the x-rays taken at birth did not show a rib fracture.  (Id. at 116.)  In addition, he testified the autopsy did not show any evidence of a subdural hematoma earlier than two to three weeks before her death, and no evidence of a subdural hematoma at the time of birth.  (Id.)

Although Dr. Eisele's opinion was partially based on his belief that Priscilla did not spend an appreciable amount of time in the birth canal, Petitioner's experts can only theorize Priscilla had an undiagnosed brain injury at birth.  According to his experts and the medical journals he has submitted, subdural hematomas sometimes, but not always, occur during birth.  (See Pet'rs Lodgments, Ex. A at 2, ECF No. 12; Lodgment 4, vol. 3 at Exs. EE, NN.)  Moreover, there is significant medical evidence supporting the conclusion that none of Priscilla's head injuries were from birth.  Indeed, even Dr. Leetsma states in his declaration that "the oldest component of the subdural hematoma(s) is consistent with an age of a month or so," not with birth.  As such, Gimenez has not established Eisele's testimony was false.

Ground seven is Gimenez's final false evidence claim.  In it, he contends Dr.

1    Alexander falsely testified Priscilla's CT scans which show the pattern of injuries suffered by

2    Priscilla "proves" she was shaken.  (Pet. at 14, ECF No. 1; Mem. of P. & A. Supp. Pet. at 26,

3    ECF No. 11.)   Gimenez contends Dr. Alexander has repudiated this belief in a recent

4    textbook he co-authored.  (Pet. at 14, ECF No. 1; Mem. of P. & A. Supp. Pet. at 26, ECF No.

5    11.)

6         At trial, Dr. Alexander testified that "many people say" the kind of cerebral

7    hemorrhaging visible on Priscilla's CT scans is "basically diagnostic of a shaken baby."

8    (Lodgment No. 12, vol. 2 at 350.)  He also stated that the condition is seen in shaken babies

9    "and really nothing else" because "it just seems to be an area that's susceptible to shaking,

10   that when you have shaking effects that's an area that gets affected as opposed to just

11   being other areas of the brain."  (Id.)   Later, he testified that the pattern of injuries in

12   Priscilla's case are ones that are seen in shaken babies and not in a child who had problems

13   from birth.  (Id. at 354.)

14        The textbook excerpts cited by Gimenez as support for his claim that Dr. Alexander

15   no longer believes his own trial testimony is from a book co-authored, or perhaps co-edited,

16   by Dr. Alexander.  (See Lodgment No. 4, vol. 3, Ex. AA at 2 [article authored by Dr. Andrew

17   P. Sirotnak and Dr. Lori D. Frasier].)  However, the excerpts from Dr. Alexander's book also

18   state:

19          — "[Retinal hemorrhages], [subdural hematomas], and rib fractures form a

20          common triad of injury seen in abusive head trauma." (Id. at 15.)

21          — "[T]he cause of subdural hemorrhages in infants is most often related to

22          trauma, and of those causes, [abusive head trauma] is most common." (Id.

23          at 7.)

24          — "Except in cases of abusive injury, spontaneous subdural hemorrhages are

25          rarely seen in young infants." (Id. at 10.)

26          — "Acute subdural hematomas are readily identifiable by CT due to the

27          hyperattenuating appearance of freshly clotted blood."  (Id.)

28   Given this, Dr. Alexander's book excerpts cannot reasonably be taken as a repudiation

12cv1137

by Dr. Alexander of his trial testimony.  Interestingly, Gimenez has not secured a declaration from Dr. Alexander himself regarding how, if at all, his current opinions vary from his testimony at trial.

As support for this claim, Gimenez also submits a declaration and a medical journal article, both authored by Dr. Barnes.  Based on his research, Dr. Barnes believes accidental trauma cannot be distinguished from non-accidental trauma solely on radiological images. Dr. Barnes states in his declaration that he believes Priscilla's CT scans "require a differential diagnosis which includes cerebral venous thrombosis, coagulopathy, hypoxia-ischemia, and infection . . .," and that "[t]here are no imaging findings that are characteristic of, or specific for, trauma, including nonaccidental injury."   (Pet'rs Lodgments, Ex. B at 1, Ex. KK at 1-9.) Dr. Barnes' article and declaration simply express a different medical opinion about the medical evidence in this case.  There is no substantial evidence that Dr. Alexander's opinion is "false" or wrong, or that Dr. Alexander or other experts do not currently believe Priscilla's injuries were caused by non-accidental trauma, such as shaking.  Thus, Gimenez's claim that Dr. Alexander's testimony was false is without foundation.

Gimenez's attempt to argue in claims sixteen through twenty-six that his actual innocence is a separate constitutional error which satisfies § 2244(b)(2)(B)(ii) also fails.  As Respondent notes, whether actual innocence is itself constitutional error is an open question. See District Att'ys Office for Third Judicial Dist. v. Osborne, 557 U.S. 52, 71-72 (2009). Indeed, the Tenth and Eleventh Circuits have read § 2244(b)(2)(B)(ii) as requiring an independent constitutional violation to be shown *in addition to* actual innocence.  See In re Davis, 565 F3d 810, 832-24 (11th Cir. 2009); Case v. Hatch, 731 F.3d 1015, 1037 (10th Cir. 2013).    But even assuming a free standing actual innocence claim can satisfy § 2244(b)(2)(B)(ii), Gimenez has not established he is actually innocent because he has not shown that even with the new expert testimony, no reasonable fact finder would have found him guilty.  A reasonable jury could credit the prosecution's experts' medical opinions about the cause of Priscilla's death over Gimenez's experts.

In sum, Gimenez seeks to establish constitutional error occurred at his trial, either via

23

false evidence or actual innocence, with evidence of an ongoing and spirited debate within the medical community as to the mechanics of injury, symptoms, methods of diagnosis, and scientific bases for what was formerly referred to as shaken baby syndrome and is now termed abusive head trauma. The varying medical opinions of the experts submitted by the parties themselves indicate there are many conflicting views held by medical professionals about this topic. (See Pet'rs Lodgments, ECF No. 12; Lodgment No. 4 vols. 1-3; Lodgment No 6, Exh. 3-5 [declarations of Dr. Christina Stanley and Dr. Alex Levin].) Even a brief investigation yields current articles that illustrate the depth and breadth of this debate. (See, e.g., Sandeep Narang, M.D., J.D., John D. Melville, M.D., Christopher S. Greely, M.D., James D. Anderst, M.D., Shannon L Carpenter, M.D., Betty Spivack, M.D., A Daubert Analysis of Abusive Head Trauma/Shaken Baby Syndrome — Part II: An Examination of the Differential Diagnosis (not finalized or published) (July 1, 2013); Sandeep Narang, M.D., J.D., A Daubert Analysis of Abusive Head Trauma/Shaken Baby Syndrome, 11 Hous. J. Health L. & Pol'y 505-633 (2011).)

This is not a case where the science upon which Gimenez was convicted is now considered "junk science," nor is it a case where current scientific methods, such as DNA analysis, definitively exclude Gimenez as the agent of Priscilla's death. Rather, it is a case which involves scientific and medical judgment and a forceful debate among experts in the field. Although medical opinion as to the mechanics of injury in infant head trauma and how to diagnose shaken baby syndrome/abusive head trauma has evolved over time, such a diagnosis was not false at the time, nor has Gimenez established it is currently false as opposed to simply being a matter of controversy and judgment. Gimenez has not satisfied § 2244(b)(2)(B)(ii) by establishing constitutional error occurred at his trial.

Even assuming constitutional error did occur, Gimenez has not established that, but for that error, no reasonable factfinder would have found him guilty. See 29 U.S.C. § 2244(b)(2)(B)(ii). This standard is the same as that announced in Jackson v. Virginia, 443 U.S. 307 (1979), which requires the Court to deny such a finding if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Boshears, 110 F.3d at 1541 (applying the Jackson standard to an application to file a successive petition pursuant to 28 U.S.C. § 2244(b).)  As discussed above, contrary to his claims that the medical community has wholly rejected the diagnosis of shaken baby syndrome/abusive head trauma based on the symptoms and injuries exhibited by Priscilla, Gimenez has only presented evidence that there exists a spirited and forceful debate among medical professionals as to the symptoms, mechanism of injury and diagnosis of abusive head trauma.  There are respected medical and academic professionals who continue to hold the opinion that the injuries Priscilla sustained — a particular type of subdural hematoma and retinal hemorrhaging, combined with a rib fracture — are indicative of shaken baby syndrome/abusive head trauma, including some of the experts Gimenez cites to or argues have changed their position.  (See Pet'rs Lodgments, Ex. AA at 7, 10, 12, 15, Ex. EE at 7.) A jury could rationally believe those medical experts over Gimenez's experts.  As such, he has not shown that no reasonable factfinder would have found him guilty.

For all the foregoing reasons, Gimenez has not shown constitutional error occurred at his trial, either in the form of false evidence or that he is actually innocent of the murder of Priscilla Gimenez, or that, but for constitutional error, no reasonable fact finder would have found him guilty.  Accordingly, the Court **RECOMMENDS** claims one through seven and sixteen through twenty-six be **DISMISSED**.

D.  The Cumulative Error Claim (claim 27) and § 2244(b)(2)(B)(i) and (ii)

In claim twenty-seven, Gimenez argues the cumulative effect of the ineffective assistance of counsel errors, the false evidence errors, and his actual innocence violated his Sixth Amendment right to counsel and federal due process rights.  (Pet. at 24, ECF No. 1; Mem. of P. & A. Supp. Pet. at 77-78.)

Gimenez's claim regarding the cumulative effect of the ineffective assistance of counsel errors must be dismissed for the same reasons his individual ineffective assistance of counsel claims must be dismissed.  First, they are barred pursuant to 28 U.S.C. § 2244(b)(1).  See Cooper, 510 F.3d at 931; Babbit, 177 F.3d at 764.  Second, if they are not barred by § 2244(b)(1), they must be dismissed because Gimenez has not satisfied

1   § 2244(b)(2)(B)(i) in that the factual predicate for the claim has been known to Gimenez

2   since his 1992 trial.

3   / / /

4        Gimenez's claim regarding the cumulative effect of the false evidence claims also fails.

5   "Cumulative error applies where, 'although no single trial error examined in isolation is

6   sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still

7   prejudice a defendant.'" Mancuso v. Olivarez, 292 F.3d 939, 958 (9th Cir. 2002) (quoting

8   United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir.1996). The Court has concluded in

9   section IV(C) of this Report and Recommendation (R&R) that the presentation of false

10  evidence, as opposed to perjury, is not a federal constitutional violation, and, in any event,

11  the evidence presented at trial was not false. Because the Court has concluded no errors

12  occurred, no cumulative error occurred. Nor has Gimenez established he is actually innocent

13  of Priscilla's murder, as he has not established that no reasonable factfinder could have

14  found him guilty even if his new evidence was presented.

15        E.   Timeliness

16        Respondent contends the petition is untimely because it was filed more than a year

17  after the factual predicate for his claims became known to Gimenez in November of 2008

18  and there is not sufficient statutory tolling to make the petition timely.  (Mem. of P. & A.

19  Supp. Mot. to Dismiss at 53-62, ECF No. 18.)  Gimenez argues first that the one-year statute

20  of limitations may not apply to successive petitions; second, if it does apply he may be

21  excused from the statute of limitations by his actual innocence; and third, the factual

22  predicate of his claims became known to him on August 24, 2009, when he filed his first

23  state habeas petition, he has been diligently pursuing his claims since then, and thus the

24  petition is timely.  (Opp. to Mot. to Dismiss at 37-46, ECF No. 26.)

25             i.   Whether the One-Year Statute of Limitations Applies

26        First, the Court concludes Gimenez's argument that the one-year statute of limitations

27  of 28 U.S.C. § 2244(d) may not apply to a successive petitions is incorrect.  Gimenez cites

28  no case that so holds, and the Court has not located one either.  The statute states that "[a]

26

1-year period of limitation shall apply to an *application* for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1). Gimenez's petition is very clearly an "application for writ of habeas corpus by a person in custody pursuant to the judgment of a State court." In the absence of any contrary authority, and given the clear wording of the statute, the Court concludes the one-year statute of limitations applies.

ii. <u>Commencement of the Statute of Limitations</u>

28 U.S.C. § 2244(d)(1) provides several dates for the commencement of the one-year statute of limitations. The only provision applicable to Gimenez's case is § 2244(d)(1)(D), which states "the limitation period shall run from . . . "the date on which factual predicate of [Gimenez's claims] could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). The statute specifically provides for the Court to determine timeliness on a claim by claim basis when, as here, the statute of limitations is to be calculated pursuant to § 2244(d)(1)(D) (stating that "[t]he limitation period shall run from the latest of . . . (D) the date on which the factual predicate of the *claim or claims* presented could have been discovered through the exercise of due diligence").

The Court concluded above in section IV(A) of this Report and Recommendation that Gimenez had not met the standard for proceeding with a successive petition as stated in § 2244(b)(2)(b)(i) — that "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence" — as to all of his ineffective assistance of counsel claims because they relate entirely to matters which occurred at trial and about which he has known since that time. His inability to satisfy that provision necessarily means he has not satisfied 28 U.S.C. § 2244(d)(1)(D) either, because the factual predicate for the ineffective assistance of counsel claims could have been discovered through the exercise of due diligence at the time of his conviction in 1992, or certainly by the time of his first federal habeas corpus petition in 1999. His successive federal petition was filed on May 9, 2012, thirteen years after his first federal habeas corpus petition and twenty years after his trial. Accordingly, Gimenez's ineffective assistance of counsel claims, claims eight

1    through fifteen, are untimely.

2        As to Gimenez's false evidence and actual innocence claims, the question is when

3    Gimenez could have discovered, through the exercise of due diligence, the factual predicate

4    underlying those claims, namely, that the medical community's view of shaken baby

5    syndrome/abusive head trauma, had sufficiently changed and evolved such that there was

6    significant debate over the diagnosis, method of injury, and injuries related to it.  The

7    answer can be discerned from the Gimenez's experts themselves.

8        Other than the declarations submitted by Dr. Bonnell and Dr. Cohen, all of Gimenez's

9    experts' declarations were signed in 2007 or 2008; the latest of those declarations was

10   signed on July 22, 2008.  (See Pet'rs Lodgments, Ex. D, ECF No. 12.)  Dr. Bonnell's

11   declaration includes his opinion that: (1) the retinal hemorrhaging in Priscilla's eyes was less

12   than 72 hours old and thus occurred in the hospital as a result of cranial pressure; (2) the

13   superior saggital sinus cavity contains an antemortem clot; (3) Priscilla likely had a clotting

14   problem; and (4) Priscilla suffered from gastroesophageal reflux disease, or GERD, which

15   could have resulted in hypoxia, thus causing the subdural hematoma.  (See Pet'rs

16   Lodgments, Ex. F.)  Dr. Cohen's declaration contains her opinion that Priscilla was infected

17   with chorioamnionitis and suffered from GERD, both of which could have contributed to or

18   caused Priscilla's death; Dr. Cohen also indicated the retinal hemorrhages occurred while

19   Priscilla was in the hospital.  (See id. at Ex. G.)  Drs. Leetsma, Barnes, Plunkett, Wolfe and

20   Whitlock, however, also indicated in their declarations the same opinions regarding the

21   cause of Priscilla's retinal hemorrhages and subdural hematoma, and advanced the theory

22   that cortical venous thrombosis or saggital sinus thrombosis likely caused her death. Thus,

23   Gimenez was certainly aware of the factual predicate for those claims with at the time Drs.

24   Leetsma, Barnes, Plunkett, Wolfe and Whitlock provided their declarations.

25       The only information contained in the declarations from Drs. Bonnell and Cohen not

26   contained in the declarations from Gimenez's other experts is their theory that GERD or

27   chorioamnionitis caused or contributed to Priscilla's death.  The medical records do not

28   clearly show Priscilla suffered from chrorioamnionitis.  While she was placed on an antibiotic

as a precaution due to the circumstances of her birth and tests showing the placenta was infected, her lab tests were eventually negative for infection.  (See Lodgment No. 6, Ex. 15 at 3-8.)  In any event, the medical records show the possibility that Priscilla did suffer from chorioamnionitis was known to Gimenez in 1991.  Gimenez was also aware that Priscilla had been diagnosed with GERD while she was in the hospital on August 7 and 10, 1991.  (See id. at Exs. 8 at 1, 9 at 1.)

In addition, all but two of the medical journal articles submitted by Gimenez which discuss the controversy over the diagnosis of shaken baby syndrome/abusive head trauma or which support his experts' analysis of the cause of Priscilla's death are dated between August of 2001 and August of 2008.  (See Lodgment No. 4, vol. 3, Exs. AA-BB, DD-EE, HH-NN, QQ, RR.)  Significantly, "The Goudge Report," which Petitioner's attorney states "found that [shaken baby syndrome] was no longer accepted by the majority of forensic pathologists when determining the cause of death" was released on October 1, 2008.  (See Lodgment No. 4, vol. 1, Ex. L; see also, vol. 4 at Ex. O [declaration of Janeen D'Angelo].)  Gimenez's attorney, Janeen D'Angelo, states in her declaration that she submitted "a comprehensive analysis of [Gimenez's] case on September 19, 2008," and "[o]n November 26, 2008 [she] provided [the San Diego County District Attorney's Office] with a 'Draft Petition' based on the new scientific advances made in the area of head trauma and SBS, and relying on the just released Goudge Report out of Canada which found that SBS was no longer accepted by the majority of pathologists when determining the cause of death."  (Lodgment No. 4, vol. 2, Ex. O at 4-5.)

The only two articles which are dated after August of 2008 are "Neonatal Cerebral Sinovenous Thrombosis: Sifting the Evidence for a Diagnostic Plan and Treatment Strategy," by Janet Yang, Anthony Chan, David Callen and Bosco Paes (2010) and "Imaging Nonaccidental Injury and the Mimics: Issues and Controversies in the Era of Evidence-Based Medicine," by Dr. Patrick Barnes (2011), one of Gimenez's new experts.  (See Lodgment No. 4, vol. 3 at Ex. JJ, KK.)  Having reviewed these articles, the Court concludes the information contained in the article by Yang, Chan, Callen and Paes is also contained in Exhibits AA, II,

and MM. (See id. at Exs. AA ["Abusive Head Trauma in Infants and Children," by Dr. Randall Alexander (2006)] at 6, II ["Cerebral Venus Thrombosis in Children," by Gabrielle DeVeber, M.D., Maureen Andrew, M.D., Colleen Adams, M.B., Bruse Bjornson, M.D., Frances Booth, M.D., David J. Buckley, M.D., Ch.B., Carol S. Camfield, M.D., Michele David, M.D., Peter Humphreys, M.D., Pierre Langevin, M.D. E. Athen MacDonald, M.D. and Jane Gillett, M.D. (Aug. 9, 2001)], MM ["Cerebral Venous Sinus Thrombosis in Children: Risk Factors, Presentation, Diagnosis and Outcome," by G. Sebire, B. Tabarki, D.E. Saunders, I. Leroy, R. Liesner, C. Saint-Martin, B. Husson, A.N. Williams, A. Wade, and F.J. Kirkham (2005)].) As to Dr. Barnes, he provided a declaration to Gimenez in April of 2008. The views expressed in his 2011 article concern the biomechanics of head injuries in infants and young children, and he questions the general underpinnings of the assumption that a "triad" of injuries — subdural hemorrhage, retinal hemorrhage and encephalopathy — characterizes shaken baby syndrome. (See Lodgment No 4, vol. 3, Ex. KK.) The same essential information was contained, however, in an article written by Dr. Barnes and Dr. Michael Krasnokutsky in 2007, entitled "Imaging of the Central Nervous System in Suspected or Alleged Nonaccidental Injury, Including the Mimics." (See id., Ex. BB.)

Although a precise date is difficult to discern, it seems clear to the Court from the preceding review of Gimenez's evidence that Gimenez could have discovered, and in fact did discover, the factual predicate for his false evidence and actual innocence claims by, at the latest, the fall of 2008 when attorney D'Angelo presented the "comprehensive analysis" of Gimenez's case and the draft petition to the San Diego County District Attorney's Office. The Court agrees that the presentation of the draft petition to the District Attorney's Office on November 26, 2008, appears to be the latest date from which the one-year statute of limitations can be calculated. Absent any statutory or equitable tolling, Gimenez's federal habeas corpus petition was due on November 26, 2009.

### iii. Statutory Tolling

Gimenez filed his first state habeas corpus petition on August 24, 2009. (Lodgment No. 3, vol. 2 at Lodgment No. 25.) By that time, 271 days of the 365 days permitted by the

statute had elapsed, and he had 94 days within which to timely file his federal habeas corpus petition. The statute of limitations was tolled while the Superior Court considered Gimenez's petition. 28 U.S.C. § 2244(d)(2). The Superior Court denied his petition on October 18, 2010. The statute began running again the next day and expired on January 20, 2011, 94 days later. He did not file his next state habeas corpus petition until May 9, 2011, and by that time the statute of limitations had expired. (See Lodgment No. 2.) His federal petition is therefore untimely unless Gimenez is entitled to either tolling for the period between state court filings (gap tolling) or equitable tolling. Gimenez concedes he is not entitled to any gap tolling. (See Pet'rs Opp. to Mot. to Dismiss at 39, ECF No. 26.) The federal petition is therefore untimely unless Gimenez is entitled to sufficient equitable tolling to make it timely.

### iv. Equitable Tolling

Gimenez argues he is entitled to be excused from the expiration of the statute of limitations because he is actually innocent. (Pet'rs Opp'n to Mot. to Dismiss at 42-46, ECF No. 26.) The Supreme Court recently held in McQuiggin v. Perkins, __ U.S. __, 133 S. Ct. 1924 (2013) as follows:

> We hold that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in Schlup and House, or, as in this case, expiration of the statute of limitations. We caution, however, that tenable actual-innocence gateway pleas are rare: "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." Schlup, 513 U.S., at 329 [citations omitted]; see House, 547 U.S., at 538 [citations omitted] (emphasizing that the Schlup standard is "demanding" and seldom met).

McQuiggin, 133 S. Ct. at 1928.

As discussed above, Gimenez has not persuaded the Court that, even considering the new evidence, no reasonable juror would have found him guilty beyond a reasonable doubt. Although there are experts who now believe shaken baby syndrome/abusive head trauma cannot be diagnosed from the injuries suffered by Priscilla or that Priscilla died from abusive head trauma, there are also experts who remain convinced about the continuing viability of shaken baby syndrome and that the injuries suffered by Priscilla were caused by Gimenez

31

12cv1137

1   shaking or otherwise assaulting Priscilla, causing her death.  A reasonable juror could accept

2   the opinion of those experts and conclude that Gimenez murdered his daughter.  Thus,

3   Gimenez is not entitled to any equitable tolling.

4                                   v.   The Petition is Untimely

5          The one-year statute of limitations pursuant to 28 U.S.C. § 2244(d)(1) commenced

6   on November 26, 2008.  Absent any statutory or equitable tolling, Gimenez had until

7   November 26, 2009, to file his federal habeas corpus petition.  Gimenez filed his first state

8   habeas corpus petition on August 24, 2009.  By that time, 271 days of the 365 days

9   permitted by the statute had elapsed, and he had 94 days within which to timely file his

10  federal habeas corpus petition.  The statute of limitations was tolled while the Superior Court

11  considered Gimenez's petition.  28 U.S.C. § 2244(d)(2).  The Superior Court denied his

12  petition on October 18, 2010.  The statute began running again the next day and expired

13  on January 20, 2011, 94 days later.  He did not file his next state habeas corpus petition in

14  the California appellate court until May 9, 2012, and, because he is not entitled to any

15  further statutory or equitable tolling, the one-year statute of limitations had expired by that

16  time.  (Lodgment No. 2.)  Accordingly, his petition is untimely.

17  **IV.   CONCLUSION AND RECOMMENDATION**

18         The Court submits this Report and Recommendation to United States District Judge

19  Larry Alan Burns under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States

20  District Court for the Southern District of California.  For all the foregoing reasons, **IT IS**

21  **HEREBY RECOMMENDED** the Motion to Dismiss the Petition be **GRANTED**.

22         **IT IS FURTHER RECOMMENDED** the Court issue an Order (1) approving and

23  adopting this Report and Recommendation, (2) directing that judgment be entered granting

24  the motion to dismiss the Petition.

25         **IT IS HEREBY ORDERED** no later than **December 13, 2013**, any party to this

26  action may file written objections with the Court and serve a copy on all parties.  The

27  document should be captioned "Objections to Report and Recommendation."

28         **IT IS FURTHER ORDERED** any Reply to the Objections shall be filed with the Court

                                              32

and served on all parties no later than **January 3, 2014**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's Order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1157 (9th Cir. 1991).

   **IT IS SO ORDERED.**


DATED:  November 22, 2013

   BARBARA L. MAJOR
   United States Magistrate Judge

33

12cv1137