1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

ALAN G. GIMENEZ,

                                    Petitioner,

       vs.

J. TIM OCHOA, Warden

                                    Respondent.

CASE NO. 12-CV-1137-LAB-BLM

**ORDER RE: RESPONDENT'S
MOTION TO DISMISS**

Over twenty years ago, on April 10, 1992, Gimenez was convicted of second degree murder for violently shaking his seven-week-old daughter Priscilla to death.  He was sentenced to an indeterminate term of fifteen years to life in prison.  Now before the Court is Respondent's motion to dismiss Gimenez's second federal habeas petition.

The petition is massive (it asserts twenty-seven claims), and so is all of the briefing (there are hundreds of pages of it), but the crux of Gimenez's petition is rather straightforward.  He argues that our medical understanding of shaken baby syndrome *today* isn't what it was *in the early 1990s* when he was tried and convicted, and that under today's evolved understanding he would not have been convicted. How so?  First, when Gimenez was tried it was the accepted view of the medical community that shaken baby syndrome could be established absent any evidence of head or neck injuries, which Priscilla *didn't* display—and that is no longer the accepted view.  Second, it's now accepted that the

symptoms of shaken baby syndrome Priscilla *did* display—swelling and bleeding of the brain, and retinal hemorrhaging—could have other causes, such as a brain bleed that begins at birth.

Because Gimenez's petition isn't his first, it has to satisfy several threshold conditions under 28 U.S.C. § 2244(b), before his claims can even be considered on their merits under § 2254(d). The R&R finds that it doesn't satisfy those conditions, and the Court agrees. But even assuming it does, the Court would also find that Gimenez isn't entitled to habeas relief under § 2254(d). For these reasons, given below, Respondent's motion to dismiss Gimenez's habeas petition is **GRANTED**.

## I.    Procedural History

This isn't Gimenez's first federal habeas petition. He previously filed a petition on May 28, 1999, represented by one of the attorneys who represents him now.[1] That petition asserted two claims. The first was an ineffective assistance of counsel claim, accusing his trial counsel of: (1) failing to obtain a report from Children's Hospital that diagnosed Priscilla with epilepsy and noted a bloody spinal tap, both of which suggest that some pre-existing injury or disease caused her death; (2) failing to obtain all of Priscilla's medical records; and (3) failing to retain and consult with a hematologist to evaluate the lab reports and offer a cause of death.[2] The second claim was a *Brady* claim, accusing the prosecution of withholding the Children's Hospital report and Priscilla's lab reports.[3] This petition was denied on October 24, 2003, and the Ninth Circuit affirmed the denial in a memorandum on May 27, 2005.[4]

Over four years later, on August 24, 2009, Gimenez started a new round of collateral

---

[1] *See* Case No. 99-CV-1133-JM-JFS.

[2] Case No. 99-CV-1133, Doc. No. 51 (R&R) at 9.

[3] Case No. 99-CV-1133, Doc. No. 51 at 26.

[4] Lodgment 24.

1  review, filing a habeas petition in San Diego Superior Court.[5]  The Superior Court denied that

2  petition on October 18, 2010.  Gimenez pressed on.  In a one-page opinion, the Court of

3  Appeal denied his petition on November 21, 2011, and in a one-sentence opinion the

4  California Supreme Court denied his petition on February 15, 2012.[6]  It is really the Superior

5  Court's denial of Gimenez's petition that's relevant here, because as the most reasoned

6  decision, and the decision the Court of Appeal expressly adopted, it is the decision this Court

7  must look to.  *Ylst v. Nunnemaker*, 501 U.S. 797, 805–06 (1991).

8       Gimenez filed his second federal habeas petition in this Court on May 9, 2012, and

9  he obtained the Ninth Circuit's authorization to file it on October 18, 2012.[7]  *See* 28 U.S.C.

10  § 2244(b)(3)(A).

11  **II.    Gimenez's Petition**

12       Gimenez's present petition asserts twenty-seven claims.  They can be grouped.

13       **A.    Claims 1 through 7**

14       Gimenez's  first seven claims argue that his conviction violated the Due Process

15  Clause of the Fourteenth Amendment because it was based on the "false material

16  testimony" of medical experts.  Gimenez doesn't argue that their testimony was perjured or

17  nefarious in any way, but rather that it has been discredited by more recent testimony and/or

18  by the evolved medical understanding of shaken baby syndrome.  For example, Gimenez's

19  first claim is that the pathologist who performed Priscilla's autopsy and testified against him,

20  Dr. Eisele, was wrong about the age of subdural bleeding.  He testified that the bleeding was

21  only weeks old when Priscilla died, but he relied on the textbook of a prominent

22  neuropathologist, Dr. Leestma, who now refutes that conclusion.  As do others:

23           Eisele testified he relied on a textbook by Dr. Leestma, a
            prominent neuropathologist. Dr. Leestma has reviewed the case
24           and concluded the bleeding began at or shortly after birth and
            was chronic and that Dr. Eisele's methodology was deficient.
25           Dr. Wolfe, also a neuropathologist, and Dr. Plunkett, a

26  _____

27       [5] Doc. No. 19-6 at 63.

       [6] Lodgments 8, 10.
28
       [7] Doc. No. 4.

pathologist, agree the bleeding was chronic and most likely began at birth.  Dr. Eisele's testimony was materially false.[8]

Gimenez has submitted declarations from doctors Leestma, Wolfe, and Plunkett to back this claim up.[9]

The Leestma declaration, dated January 22, 2007, is seven pages long and concludes:

> In summary, I can find no persuasive evidence that Priscilla Gimenez was the victim of abuse.  Her injuries likely date back to birth and continued to evolve during her life culminating in her admission to hospital and her subsequent death due to complications of her subdural hematoma and cerebral venous/sagittal sinus thrombosis . . . .  The findings that were used by others involved with the case to substantiate the allegation of the shaken baby syndrome lack scientific foundation or credibility as discussed above.  I hold these opinions to a reasonable degree of medical and scientific certainty based upon the objective evidence (radiological and pathological studies) and relevant medical literature.

Dr. Leestma also wrote a supplemental letter on July 26, 2010, noting that recent contributions to the medical literature on shaken baby syndrome "further discredit the notions held by many that subdural hematomas in infants are evidence of inflicted trauma."  Dr. Wolfe, a neuropathologist at the Mt. Sinai Medical Center in New York City, concluded in a July 22, 2008 letter to Gimenez's counsel that the cause of Priscilla's death was "Natural Disease."  Dr. Plunkett, a retired coroner and neuropathologist in Minnesota, explained that much of what was taught and understood about infant head injuries in 1991 is no longer supportable, and that "[t]here is no evidence to support a conclusion that abuse caused the signs and symptoms leading to Priscilla's death."

This first claim is representative of the nature of the second through seventh claims in Gimenez's habeas petition.  The clear theme is that, on a closer analysis of Priscilla's medical records by esteemed neuropathologists, and under modern, advanced understandings of shaken baby syndrome, Priscilla wasn't murdered by Gimenez but rather died of natural causes.  Gimenez takes this to mean that the evidence by which he was

---

[8] Pet. at 6.

[9] The declarations are Exhibits A, C, and D to his habeas petition, Doc. No. 12-2.

1  convicted was false, in violation of his rights under the Due Process Clause of the
2  Fourteenth Amendment.

3      **B.    Claims 8 through 15**

4      These eight claims are ineffective assistance of counsel claims.  They are easy to
5  describe.

6      Gimenez argues that his trial counsel was ineffective for: (1) hiring an incompetent
7  pathologist to testify, Dr. Hormez Guard, who had previously been fired by the San Diego
8  Medical Examiner's office (Claim 8); (2) failing to hire a radiologist to interpret and testify
9  about Priscilla's x-rays and CT scans (Claim 9); (3) calling as a defense witness a radiologist,
10  Dr. Lee Harvey, who actually agreed with the prosecution's theory of the case (Claim 10);
11  (4) failing to provide a defense pediatric neurologist, Dr. Tiznado-Garcia, with CT scans the
12  doctor asked to review before reaching an opinion on the cause of Priscilla's death (Claim
13  11); (5) failing to present any credible testimony from qualified experts suggesting an
14  alternative, natural cause of Priscilla's death (Claim 12); (6) failing to subpoena all of
15  Priscilla's medical records and provide them to the defense's expert witnesses (Claim 13);
16  (7) failing to properly interview or prepare the family physician, Dr. Kerley, who delivered
17  Priscilla and could have testified that her birth was atypical (Claim 14); and (8) failing to
18  meaningfully challenge the prosecution's medical evidence with available forensic evidence
19  (Claim 15).

20      **C.    Claims 16 through 26**

21      Gimenez's sixteenth through twenty-sixth claims are actual innocence claims.  For
22  example, his sixteenth claim is that the accepted proof of shaken baby syndrome when he
23  was tried—the "triad" of subdural hematoma, retinal hemorrhage, and brain swelling—is no
24  longer the accepted proof of shaken baby syndrome.[10]   The twenty-third claim, for another
25  example, argues that a lab technician's inability to draw blood from Priscilla shows she had
26  a congenital and chronic bleeding disorder, "which was never tested for and which would

27

28

_____

[10] Pet. at 9F.

1  have explained the stroke-like clot that resulted in her death."[11]

2      These claims aren't fundamentally different from Gimenez's first eight claims.  The

3  first eight claims argue that modern medical knowledge and analysis of infant head injuries

4  discredit the testimony and evidence that convicted Gimenez.  These later claims argue that

5  modern knowledge and analysis actually establish his innocence.  But both sets of claims

6  essentially argue that were Gimenez tried today, the evidence at trial would be very different

7  and he would not be convicted of murdering Priscilla.

8      **D.    Claim 27**

9      Gimenez's final claim is a cumulative claim that simply tallies up all of his others

10  relating to false evidence, ineffective assistance of counsel, and new evidence.[12]

11  **III.   Discussion**

12      The Court will start where the R&R does, with Gimenez's ineffective assistance

13  claims.  There are two, threshold problems with the claims.  The first problem is that

14  Gimenez already asserted ineffective assistance in his original habeas petition, and his

15  "new" claims may not be different enough such that he can assert them in a second,

16  successive petition.  This problem arises under 28 U.S.C. § 2244(b)(1), which mandates that

17  "[a] claim presented in a second or successive habeas corpus application under section

18  2254 that was presented in a prior application shall be dismissed."  The second problem is

19  that Gimenez was able to assert these claims earlier than he did.  This problem arises under

20  28 U.S.C. § 2244(b)(2)(B)(I), which mandates that a claim *not* previously presented may be

21  asserted if "the factual predicate for the claim could not have been discovered previously

22  through the exercise of due diligence."

23      **A. The § 2244(b)(1) Problem with Gimenez's Ineffective Assistance Claims**

24      As the Court noted above, Gimenez's first habeas petition asserted two ineffective

25  assistance of counsel claims, one of which was that his trial counsel: (1) failed to obtain a

26  report from Children's Hospital that diagnosed Priscilla with epilepsy and noted a bloody

27  _____

28      [11] Pet. at 9I.

      [12] Pet. at 9K.

- 6 -

1  spinal tap, both of which suggest that some pre-existing injury or disease caused her death;

2  (2) failed to obtain all of Priscilla's medical records; and (3) failed to retain and consult with

3  a hematologist to evaluate the lab reports and offer a cause of death.[13]

4         Under § 2244(b)(1), "AEDPA requires the dismissal of claims that were previously

5  presented in a federal habeas petition." *Babbitt v. Woodford*, 177 F.3d 744, 745 (9th Cir.

6  1999). The Ninth Circuit also made clear in *Babbitt* that "claims" is more categorical than it

7  is specific, and that where the "gravamen" of a legal claim is "essentially the same," it has

8  been previously presented under § 2241(b)(1). *Id.* at 746. It doesn't matter if the factual

9  allegations behind the claim are different:

10           Although Babbitt asserts new factual explanations for his
        counsel's ineffectiveness at trial, the gravamen of his legal

11          argument is essentially the same. Because we have already
        determined that trial counsel's performance during the guilt,

12          sanity, and penalty phases was not constitutionally deficient, we
        will not consider new factual grounds in support of the same

13          legal claim that was previously presented.

14  *Id.* *Babbitt* is an instructive case. The petitioner argued in his first petition that his trial

15  counsel was ineffective for failing to present a PTSD defense during the guilt or mitigation

16  phases of his trial. In his second petition, the petitioner argued that his trial counsel abused

17  alcohol during the trial. Even though there's a clear difference between failing to put on

18  relevant, mitigating, and identifiable evidence at trial, and being generally impaired at trial,

19  the Ninth Circuit held that the second claim was barred under § 2244(b)(1).[14]

20

21         [13] Case No. 99-CV-1133, Doc. No. 51 (R&R) at 9.

22         [14] In Gimenez's objection to the R&R, he suggests that the second ineffective
23  assistance claim in *Babbit* was that trial counsel's alcohol abuse was responsible for his
failure to present a PTSD defense, which of course makes it very similar to an ineffective
assistance claim that trial counsel failed to put on a PTSD defense but doesn't offer an
24  explanation. (Obj. at 5.) The Court doesn't read the *Babbitt* opinion that way. As the Ninth
Circuit described it, the petitioner's second claim was that "because of his trial counsel's
25  alcohol abuse, his counsel was ineffective during the guilt, sanity, and penalty phases of
Babbitt's trial." *Id.* at 746. That is a general claim about his counsel's overall performance
26  or capacity at trial. It's not simply another theory as to why he failed to present a PTSD
defense. The Court disagrees with Gimenez's statement that "the legal claim in both
27  petitions was that counsel failed to sufficiently present a PTSD defense or to use PTSD for
mitigation" and that "[t]he new factual information indicated that these failures were not
28  simply based on ordinary deficient performance, but also on alcohol consumption." (Obj. at
5–6.)

1    Subsequent opinions have followed *Babbitt*'s lead.  In *Cooper v. Brown*, the Ninth

2    Circuit held that an ineffective assistance claim in a capital case based on trial counsel's

3    failure "to advocate regarding the evidence of . . . hair in the victims' hands" was foreclosed

4    under § 2244(b)(1) by previous ineffective assistance claims based on trial counsel's failure

5    "to advocate regarding forensic evidence."  510 F.3d 870, 931 (9th Cir. 2007).  While those

6    two claims naturally sound quite similar—they both involve trial counsel's handling of forensic

7    evidence at trial—the court used quite broad language to explain the force of § 2244(b)(1):

8    "If Petitioner has previously adjudicated a claim of ineffective assistance of counsel in this

9    Court, his pending claim of ineffective assistance must be dismissed.  New factual grounds

10   in support of a legal claim that has already been presented, i.e., ineffective assistance, are

11   not sufficient to evade the mandatory dismissal requirement."  *Id.* at 931.[15]

12   Gimenez's own briefing walks right into the wall *Babbitt* and *Cooper* set up, arguing

13   that "[t]he ineffective assistance of counsel claims in the new petition . . . have factual bases

14   that are completely different than the factual bases of the ineffective assistance of counsel

15   claims in the original petition."[16]  That's precisely what Gimenez does *not* want to argue, in

16   light of what *Babbitt* and *Cooper* say.  Gimenez says, "In none of the new claims does

17   petitioner rely on the evidentiary bases for the ineffective assistance of counsel claims in the

18   first petition."[17]  *Babbitt* and *Cooper* explicitly say that doesn't much matter.  A second

19   habeas claim "is successive if the basic thrust or gravamen of the legal claim is the same,

20

21   [15] Gimenez notes in his objection to the R&R that this language from *Cooper* is
     actually in the district court's opinion, which is appended to the Ninth Circuit's opinion.  That's
22   correct.  What Gimenez doesn't say, however, is that the Ninth Circuit effectively adopted
     the district court's analysis of the ineffective assistance claims.  Speaking of those claims,
23   the Ninth Circuit said, "Each has been adjudicated previously in one forum or another.  And
     we are in accord with the district court's treatment of all of the claims.  *See* Order at 980–85."
24   *Id.* at 887.  While the pages the Ninth Circuit references and adopts aren't the same pages
     the R&R and Court quote here, that appears to be because the district court didn't address
25   all of the ineffective assistance claims in one place.  The language and rationale for
     dismissing some claims at pages 980–985, however, is the same as that at page 931.
26   Indeed, by adopting the district court's opinion of Cooper's ineffective assistance claim that
     his trial counsel failed to introduce evidence that victims were clutching hair in their hands,
27   the Ninth Circuit is referencing pages 930–31, not just pages 980–85.

28   [16] Obj. at 7.

     [17] Obj. at 7.

1   regardless of whether the basic claim is supported by new and different legal
2   arguments . . . [or] proved by different factual allegations." *Gulbrandson v. Ryan*, 738 F.23d
3   976, 997 (9th Cir. 2013) (quoting *Babbitt*, 177 F.3d at 746).

4           Gimenez's previous ineffective assistance claims accused his trial counsel of, in
5   essence, failing to assemble and present evidence, including expert testimony, showing that
6   Priscilla died of natural causes.  That is the common thread through the allegations that he:
7   (1) failed to obtain a certain report from Children's Hospital; (2) failed to obtain all of her
8   medical records; and (3) failed to consult with a hematologist regarding the cause of her
9   death.  Setting those next to his current claims, it's clear to the Court that the "basic thrust
10  or gravamen . . . is the same." *Babbitt*, 177 F.3d at 746.

11          To be more specific, Gimenez's first two *new* ineffective assistance claims allege that
12  his trial counsel hired an incompetent pathologist and *failed to hire* a radiologist.[18]  His third
13  new claim alleges that his counsel called *the wrong* radiologist, his fourth new claim alleges
14  that he didn't properly prepare a defense pediatric neurologist, and his fifth claim alleges that
15  he didn't present any expert testimony suggesting that Priscilla died of natural causes.[19]  His
16  six and seventh new claims, respectively, allege that his trial counsel failed to prepare all
17  defense witnesses with Priscilla's complete medical records[20] *and* failed to prepare the
18  physician who delivered her.[21]  *All of these claims* relate to trial counsel's failure to present
19  expert testimony that would have been favorable to Gimenez, which is the core of the claim
20  in his earlier petition that his counsel failed to consult a hematologist.  The remaining claim
21  in his new petition—that his trial counsel failed to utilize available forensic evidence to
22  challenge the prosecution's medical evidence—is comparable to his previous claim that his

23  ─────────────

24  [18] Pet. at 9B

25  [19] Pet. at 9C–D.

26  [20] Even Gimenez essentially concedes that this claim—claim 13 in his new
    petition—was previously raised.  (Obj. at 2, 7 ("The ineffective assistance of counsel claims
27  in the new petition, with the possible exception of claim 13, have factual bases that are
    completely different than the factual bases of the ineffective assistance of counsel claims
28  in the original petition.").)

    [21] Pet. at 9D.

1  trial counsel didn't obtain all relevant medical records and reports.  Gimenez argues in his

2  objection to the R&R that he hasn't just supplemented his previous ineffective assistance

3  claims with new evidence, but rather "has raised fundamentally different ineffective

4  assistance of counsel claims."[22]  The Court disagrees.  It finds that, following *Babbitt*,

5  *Cooper*, and *Gulbrandson*, Gimenez's new ineffective assistance claims are repeat claims

6  under the meaning of § 2244(b)(1).[23]

7  ## B.    The § 2244(b)(2)(B)(I) Problem with the Ineffective Assistance Claims

8  Even assuming the ineffective assistance claims Gimenez presents now weren't

9  presented in his previous habeas petition, there is yet another hurdle they must clear.  "A

10  claim presented in a second or successive habeas corpus application under section 2254

11  that was not presented in a prior application shall be dismissed unless . . . the factual

12  predicate for the claim could not have been discovered previously through the exercise of

13  due diligence."  28 U.S.C. § 2244(b)(2)(B)(I).  The R&R finds that the bases of the ineffective

14  assistance claims has been known to Gimenez since his trial in 1992.[24]  For example,

15  Gimenez's eleventh claim is that his trial counsel failed to provide a defense witness,

16  pediatric neurologist Dr. Tiznado-Garcia, with Priscilla's CT scans before he testified, which

17  forced Dr. Tiznado-Garcia to review them while testifying and then concede that he wasn't

18  even qualified to read them.  (Pet. at 9C.)  Had his trial counsel provided the CT scans to Dr.

19  Tiznado-Garcia in advance, Gimenez argues, Dr. Tiznado-Garcia could have alerted his trial

20  counsel of the need to hire a radiologist.  Obviously, this is something Gimenez knew well

21  before he filed his petition.  He knew it at the very moment that Dr. Tiznado-Garcia testified.

---

22  [22] Obj. at 7.

23  

24  [23] Gimenez says that the Ninth Circuit's recent *Pizzuto v. Blades* opinion is on his side, to the extent it held that a judicial bias claim that his trial judge announced a pre-sentencing intention to impose the death penalty didn't bar a subsequent judicial misconduct claim that the trial judge orchestrated the testimony of a damaging witness.  673 F.3d 1003, 1008 n.1 (9th Cir. 2012).  The Court disagrees.  Not only is there a categorical difference between a judicial *bias* claim at sentencing and a judicial *misconduct* claim at trial, but the difference between those two claims is simply more apparent than the difference between Gimenez's ineffective assistance claims at issue here, all of which, as the Court has said, accuse his trial counsel of putting on a bad evidentiary case.

28  [24] R&R at 8–11.

1    Gimenez's response to this in his objection to the R&R is that the factual predicates
2    of his ineffectiveness aren't *just* trial events, but also medical records that his counsel
3    continued to collect until 2009 "coupled with declarations from defense experts as these
4    medical and forensic records came into petitioner's possession."[25]   He explains: "As
5    petitioner obtained Priscilla's medical, forensic and court records, he showed them to
6    numerous experts in several different medical and scientific fields.  These experts compared
7    the newly obtained records with the medical and forensic evidence and testimony introduced
8    at trial and prepared new factual information in the form of declarations detailing their
9    findings."[26]

10    The problem with this response is that the "new factual information" is truly *new*, and
11    Gimenez's trial counsel can't be faulted for failing to assemble it in 1992.  In fact, to the
12    extent that Gimenez's other habeas claims, based on false testimony and actual innocence,
13    rely on the medical community's evolved understanding of shaken baby syndrome in recent
14    years, his ineffectiveness claims are almost logically inconsistent with them.  Either the
15    medical community's understanding of shaken baby syndrome today is not what it was in
16    1992, in which case Gimenez presses new claims of false testimony and actual innocence,
17    or the state of understanding is approximately the same, in which case Gimenez's trial
18    counsel was ineffective *at the time* in preparing and shaping expert testimony.  The Court
19    suspects it is the former.  Gimenez's objection to the R&R says that as his habeas counsel
20    was trying to collect all of Priscilla's medical records, she was also "researching the latest
21    developments in SBS and contacting experts about the case."[27]   But obviously, an
22    ineffectiveness claim dating back to 1992 cannot be based on "the latest developments" in
23    medical science in 2009.  That would obliterate the first prong of the *Strickland* analysis
24    requiring that "the defendant . . . show that counsel's representation fell below an objective
25    standard of reasonableness."  *Strickland v. Washington*, 466 U.S. 668, 688 (1984).

26
27    [25] Obj. at 11.

28    [26] Obj. at 13–14.

     [27] Obj. at 15.

We can be more specific here.  Gimenez's eighth claim—his first ineffectiveness claim—is that his trial counsel hired an incompetent pathologist, Dr. Hormez Guard, to testify at trial.  According to Gimenez, Dr. Guard "had been fired from the San Diego Medical Examiner's Office for incompetence, was unfamiliar with the specialized processes involving the aging and dating of neomembranes on the autopsy slides which confirmed Priscilla's earlier brain bleed, was unfamiliar with SBS symptoms, and had given inaccurate testimony in prior cases, all of which the prosecutor brought out and skewered him with at trial."  (Pet. at 9B.)  Even assuming none of this was known at trial or could not have been discovered with some diligence—which seems very hard to believe—the more recent expert testimony Gimenez has solicited is beyond anything his trial counsel could have been expected to assemble.  Gimenez argues in his objection to the R&R that a competent forensic pathologist, Dr. Bonnell, reviewed autopsy slides in May 2009 and "confirmed the presence of a venous clot or thrombosis *before* Priscilla died and dated the rib fracture as having occurred around birth."[28]  But Dr. Bonnell's declaration, in multiple places, lets on that his is a hindsight analysis.  He says that "[t]he American Academy of Pediatrics has recently reissued their position paper on Abusive Head Trauma eliminating the use of the term Shaken Baby Syndrome because it is an unproven mechanism of injury."[29]  He says "Although Protein-C and Protein-S deficiencies were just beginning to be understood in 1991, I saw no medical records to indicate that any testing was done on the infant to identify this as a possible cause of her forming thrombi or clots in her blood vessels."[30]  He says "[v]ery recent research from Great Britain has demonstrated that small subdural hematomas commonly occur at birth, whether that birth is by normal vaginal delivery or Caesarean section."[31]  The clear message here is that Bonnell's analysis is premised on modern understandings that Gimenez's trial counsel can't be held accountable for.  Dr. Bonnell does

---

[28] Obj. at 17.

[29] Bonnell Decl. ¶ 8.

[30] Bonnell Decl. ¶ 14.

[31] Bonnell Decl. ¶ 15.

say that "[n]europathologists from the University of California San Diego Medical Center were available for consult at this time in 1991, yet their expertise was not used,"[32] but even then it's hard to disentangle his view of what is clear today from what might have been clear in 1992.  Bonnell's declaration was executed in July 2009, and it was based on his career as a forensic pathologist leading up until that time.

Gimenez's ninth claim, for another example, is that his trial counsel failed to hire a radiologist to interpret and testify about Priscilla's x-rays and CT scans.  Had he, "he would have been able to adduce testimony demonstrating that the x-rays and CT scans showed that Priscilla died of a different cause."[33]  Gimenez claims that "[h]abeas counsel has consulted with a radiologist who has reviewed the birth x-rays and concludes they showed an abnormality which was the same as the so-called 'healing fractured rib' found on the x-rays taken just days before Priscilla's death."[34]  That radiologist is Patrick Barnes, the Chief of Pediatric Neuroradiology at Stanford University Medical Center.  He does say that "[t]he rib abnormality described is likely perinatal in origin, especially since it is present on the radiographs at birth and appears unchanged on the later films."[35]  But he goes on to immediately say "*Also, from our current base in 2007*, it is well-known that plain x-ray films are unreliable for the specific diagnosis and timing of certain bone abnormalities (e.g. rib fractures) and require confirmation by other imaging technologies (i.e. CT, MRI, or postmortem radiography)."[36]  He even says those very imaging technologies "were not available or employed for this child back in 1991."[37]  Even if some of Barnes's testimony is retrospective to the time that Gimenez was actually tried, Gimenez's petition doesn't do an adequate job of disentangling what his counsel could reasonably have been expected to do

---

[32] Bonnell Decl. ¶ 21.

[33] Pet. at 9B.

[34] Pet. at 9B.

[35] Barnes Decl. ¶ 3.

[36] Barnes Decl. ¶ 3 (emphasis added).

[37] Barnes Dec. ¶ 2.

1   in 1992 and what a reasonable lawyer defending Gimenez today would do.

2       For the reasons given in the R&R, and also the reasons given here, Gimenez's

3   objections to the R&R with respect to his ineffective assistance claims are **OVERRULED**.

4   The Court finds, first, that the claims were previously presented in his earlier habeas petition.

5   *See* 28 U.S.C. § 2244(b)(1).  It finds, in the alternative, that if they weren't previously

6   presented, their factual predicates could have been discovered previously through the

7   exercise of due diligence because they all relate to some act or omission of Gimenez's trial

8   counsel *at trial*.  *See* 28 U.S.C. § 2244(b)(2)(B)(I).  It finds, finally, that if their factual

9   predicates couldn't have been discovered previously, they are based on contemporary

10  medical and scientific knowledge for which trial counsel in 1992 cannot conceivably be held

11  responsible.   Gimenez's argument that he can show prejudice—the second prong of

12  *Strickland*—"using the declarations of experts who had recently reviewed the case, and thus

13  had access to the medical, forensic, and case evidence that the prosecution released to the

14  defense between 1998 and 2009" overlooks the fact that those experts are *contemporary*

15  experts drawing on *contemporary* understandings and advancements in medical science.

16  The Court **GRANTS** Respondent's motion to dismiss Gimenez's ineffective assistance

17  claims.

18      In the end, the Court doubts that Gimenez sees his ineffective assistance claims as

19  essential to his habeas petition.  The question this petition presents, at its core, is whether

20  limited medical knowledge in the past justifies federal habeas relief in the present.[38]

21  Gimenez has *eighteen other claims* that, in various ways, try to answer that question in the

22  affirmative.  They are where the action is.  The Court will move on to those claims now.

23      **C.   Gimenez's False Testimony Claims**

24      As a threshold matter, Gimenez's false testimony claims survive the § 2244(b)(1) and

25

26  [38] The "Introduction" to Gimenez's original habeas memorandum supports this. There
    is a sentence or two about what wasn't challenged by the defense at trial, but the
27  introduction opens and closes with what was "universally accepted" within the medical
    community in 1992 in contrast to what is "established" today.  (Doc. No. 11 at 1–2.)  In
28  addition to the ineffective assistance claims failing for the reasons the Court has given, they
    also run the risk of diluting Gimenez's habeas petition and stealing attention from his false
    testimony and actual innocence claims.

§ 2244(b)(2)(B)(I) problem that his ineffective assistance claims run into.  First, they were not presented in his previous petition, and second, they are based on newly gathered medical and forensic evidence, new analyses of that evidence by experts, and new academic research on shaken baby syndrome—none of which could have been discovered previously through the exercise of due diligence.  But these are not the only hurdles to full habeas consideration of the claims.  Gimenez must also show that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  28 U.S.C. § 2244(b)(2)(B)(ii).

There is some uncertainty—and corresponding debate between the parties—as to the significance of the words "but for constitutional error" in the statute.  As Respondent would have it, Gimenez must actually show that the false testimony was a constitutional error, which Gimenez claims is the violation of due process.[39]  As Gimenez would have it, the more sensible construction "is to accept the defendant's characterization of the error as being constitutional, subject to a cursory review to make sure the characterization corresponds to a recognized constitutional rule, and then evaluate the impact of that error on a reasonable factfinder."[40]  The R&R cites an Eleventh Circuit case, *In re Boshears*, that construed § 2244(b)(2)(B)(ii) more in line with Respondent's construction:

> First, we must identify "the facts underlying the [applicant's] claim" and accept them as true for purposes of evaluating the application.  *We next must decide whether these facts establish a constitutional error.*  Finally, we evaluate these facts in light of the evidence as a whole to determine whether, had the applicant known these facts at the time of his or her trial, the application clearly proves that the applicant could not have been convicted.
> 110 F.3d 1538, 1541 (11th Cir. 1997) (emphasis added).

But the Second Circuit has held that § 2244(b)(2)(B)(ii) requires merely the *identification* of

---

[39] To be precise, Gimenez's false testimony claims are based on the Fourteenth Amendment, while his actual innocence claims are based on the Fifth *and* Fourteenth Amendment.  (Pet. at 6–9B, 9F–9K.)

[40] Obj. at 27.

- 15 -

a constitutional error. *See Quezada v. Smith*, 624 F.3d 514, 521 (2d Cir. 2010) ("Once newly discovered evidence has been presented, the gate-keeping issues are whether Quezada has identified a constitutional error and, if so, whether he has shown by clear and convincing evidence that but for that error no reasonable jury would have found him guilty.  As noted, at this stage Quezada is required only to make a prima facie showing that these two requirements have been met.").  This language in *Quezada* comes closer to Gimenez's suggestion that a court should "accept the defendant's characterization of the error as constitutional, subject to a cursory review to make sure the characterization corresponds to a recognized constitutional rule."[41]  Likewise, after the Eleventh Circuit decided *Boshears*, it interpreted § 2244(b)(2)(B)(ii) to require that a petitioner "assert" or "allege" constitutional error.  *In re. Lambrix*, 624 F.3d 1355, 1362 (11th Cir. 2010).  The R&R concludes that "in order to survive a motion to dismiss, Gimenez must *show* constitutional error occurred."[42]  In light of the language in *Boshears*, *Quezada*, and *Lambrix*, the Court finds this conclusion to be a bit strong.  Gimenez doesn't have to *show* a due process violation, necessarily, but he does have to allege that the false testimony at issue implicates, as he puts it, "a recognized constitutional rule."[43]  That is, it must be plausible that the testimony violated Gimenez's right to due process.

The R&R, on this question, says that "Gimenez has provided no case, Ninth Circuit or otherwise, which holds due process is violated when testimony, given truthfully at the time, is later determined to be unwittingly false; nor has the Court located any such case.  Gimenez has also provided no evidence the medical experts at his trial perjured themselves or lied about their expert opinions in any way."[44]  Gimenez responds to this with four cases, each of which merit discussion.

The first case Gimenez cites is *Phillips v. Ornoski*, 673 F.3d 1168 (9th Cir. 2012), a

---

[41] Obj. at 27.

[42] R&R at 13 (emphasis added).

[43] Obj. at 27.

[44] R&R at 14.

habeas case challenging Phillips's conviction for capital murder.  Phillips's girlfriend Sharon Colman had testified against him at trial, offering critical testimony that he committed murder during the commission of a robbery.  But when she was asked by Phillips's trial counsel if she was receiving any benefit for testifying, she said no.  This wasn't true.  Her attorney, unbeknownst to her, had reached an agreement with the prosecutor that all charges against her would be dropped in exchange for her testimony, and she then encouraged Colman to trust her advice and to testify.  Colman wasn't told of the deal precisely so she wouldn't have to admit to it under cross-examination and could truthfully represent that *she* had received no offers of leniency.  The prosecutor even stressed during his closing argument that Colman hadn't been promised anything.  The Ninth Circuit held that Colman was essentially tricked into lying, and "that a witness may have been unaware of the agreement entered into on his behalf may mean that his testimony denying the existence of such an agreement is not knowingly false or perjured, but it does not mean it is not false nonetheless."  *Id*. at 1184.  Indeed, "[t]he prosecutor's effort to 'insulate' Colman from her own immunity agreement was a deliberate effort to deceive the jury—a ruse that flagrantly violated basic due process principles."  It isn't hard to distinguish *Phillips* from this case.  The false testimony in *Phillips* was not only deliberately false, it was deliberately misleading.  The Ninth Circuit labeled it as deceptive and pernicious, and likened it to the "covert subornation of perjury."  *Id.* at 1185 (citing *Hayes v. Brown*, 399 F.3d 972, 981 (9th Cir. 2005)).  One of the guiding cases in *Phillips*, *Napue v. Illinois*, held that "a conviction established through use of false evidence, *known to be such by representatives of the State*, must fall under the Fourteenth Amendment."  360 U.S. 264, 269 (1959).  None of those labels or descriptions can conceivably be attached to the testimony of the expert witnesses at Gimenez's trial in 1992.

Gimenez's next case is *Maxwell v. Roe*, also a habeas case.  628 F.3d 486 (9th Cir. 2010).  Maxwell was charged with murdering ten men in downtown Los Angeles, and the case against him rested on the testimony of an infamously dishonest jailhouse informant, Sidney Storch, who said that Maxwell confessed to the murders.  The Ninth Circuit concluded on habeas review that Storch's testimony was actually false, and that even if it

1    was offered in good faith "to permit a conviction based on uncorrected false evidence to

2    stand is a violation of a defendant's due process rights under the Fourteenth Amendment."

3    *Id.* at 507.  This is an unremarkable conclusion, as far as this case is concerned.  The

4    perjured testimony of a jailhouse informant can't be analogized to the expert testimony at

5    Gimenez's trial, which, if it was false, was only false in retrospect more than twenty years

6    later.  *Id.* at 506.

7         The third case that Gimenez offers is *Killian v. Poole*, 282 F.3d 1204 (9th Cir. 2002).

8    *Killian* is not meaningfully different from *Maxwell* and doesn't add to Gimenez's argument.

9    The defendant in *Killian* was convicted of murder based, in large part, on the perjured

10   testimony of a jailhouse informant.  *Id.* at 1206–07.  The court simply held, as it did in

11   *Maxwell*, that this violated the defendant's due process rights even over the government's

12   assurances that the testimony was offered in good faith.  *Id.* at 1209–10.  Again, this is not

13   a remarkable conclusion, and it doesn't inform this Court's treatment of expert testimony in

14   1992 that, by all accounts, wasn't perjured, or deceptive, or dishonest in any way.

15        Gimenez's last case is *Hall v. Director of Corrections*, 343 F.3d 976 (9th Cir. 2003),

16   in which a defendant was convicted of first degree murder largely on the basis of

17   incriminating written notes produced by a jailhouse informant.  After the trial, the informant

18   confessed that he fabricated the notes: "The notes purported to be a series of questions and

19   answers between Lee and Hall; after the trial, however, Lee confessed he had submitted

20   innocent or innocuous questions to Hall and then erased and altered them after Hall had

21   written his answers in order to make them incriminating."  *Id.* at 978.  Hall didn't claim that

22   the prosecution knew the notes were false, only that allowing his conviction to stand based

23   on the knowledge that they were false violated his right to due process.  *Id.* at 981.  The

24   court agreed.  *Id.* at 985.  *Hall* is deficient for the same reasons that *Phillips*, *Maxwell*, and

25   *Killian* are defective.

26        In each of these cases, the evidence at issue was deliberately and wholly false, and

27   the bearer of the evidence knew it to be false.  *Maybe* that's not true of *Phillips*, but even in

28   that case the court essentially imputed the knowledge of the witness's attorney that she

1   would receive leniency for her testimony to the witness herself, finding that "her attorney,

2   who was her agent, had accepted the immunity agreement on her behalf." *Phillips*, 673 F.3d

3   at 1185.  Gimenez tries to seek refuge in these cases because they show that unwittingly

4   false testimony can give rise to a due process claim, but that connects them to this case only

5   in the most superficial way.  The evidence at issue in each case (excluding *Phillips*) was

6   unwittingly false only to the prosecution.  Here, even accepting Gimenez's allegations, the

7   expert testimony against him in 1992 was unwittingly false to everyone in the courtroom,

8   including the experts themselves who couldn't anticipate changes in the medical

9   understanding of shaken baby syndrome twenty-plus years into the future.  And Gimenez

10  offers no authority that *this* kind of allegedly false testimony constitutes a due process

11  violation.[45]

12      Gimenez argues, in his first seven habeas claims, that the testimony against him was

13  false *based on the state of medical understanding today*.  Even assuming that's true, the

14  Court finds no authority for the proposition that a conviction based on the most up-to-date

15  knowledge in the past transforms to a violation of due process when that knowledge is

16  modified in ensuing years.  For this reason, the Court finds that Gimenez fails to even

17  identify or allege a constitutional error under § 2244(b)(2)(B)(ii).  But, even if he has—even

18  if the Court accepts that a conviction based upon knowledge that later becomes outdated

19  violates due process—the Court agrees with the R&R's thorough assessment that "Gimenez

20  has not established the expert testimony presented at his trial was false.  He has only

21  established that his new experts interpret the medical evidence differently than the experts

22

23      [45] The R&R reviewed a number of other cases cited by Gimenez and concluded, "In

24  very case the Court has reviewed . . . the alleged due process violation was based on a
    witness's perjury."  (R&R at 13.)  In his objection to the R&R, Giminez responds that "a
    number of the cases listed either do not involve perjury or involve due process issues based

25  on evidence that is merely false rather than perjured."  (Obj. at 30.)  This is a distinction with
    no real difference.  In *Dow v. Virga*, for example, "the prosecutor knowingly elicited and then

26  failed to correct false testimony," testimony that he knew at the time was false.  729 F.3d
    1041, 1042–43 (9th Cir. 2013).  Another case, *Gentry v. Sinclair*, involved a claim that a

27  witness lied about the parole benefits he received for his testimony and that the prosecutor
    knew he lied.  705 F.3d 884, 902–03 (9th Cir. 2013)  Even if the word "perjury" doesn't

28  appear in these opinions, they are still quickly distinguishable from this case, in which the
    falsity of the evidence at issue was allegedly unknown to everyone for over twenty years
    following Gimenez's conviction.

at his trial and that those new experts have different opinions about what the evidence shows."[46] And following on that, he hasn't established by clear and convincing evidence that no reasonable factfinder would have found him guilty.

Gimenez's objections to the R&R's treatment of his false testimony claims are **OVERRULED**, and Respondent's motion to dismiss those claims is **GRANTED**.

### D.   Gimenez's Actual Innocence Claims

Gimenez's actual innocence claims confront the same threshold issue as his false testimony claims—the significance of the words "but for constitutional error" in § 2244(b)(2)(B)(ii).  With his previous false testimony claims, he was at least able to assert an independent constitutional violation that rendered § 2244(b)(2)(B)(ii) intelligible, and in the following way: "the facts underling the [due process] claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for [the false testimony], no reasonable factfinder would have found the applicant guilty of the underlying offense."  The Court rejected that for the reasons given above, but it was at least an intelligible argument.

It is tougher for Gimenez, though, when it comes to his actual innocence claims, because when "actual innocence" is substituted for the "constitutional error" in the statutory language of § 2244(b)(2)(B)(ii) it renders a perplexing formulation.  The section would have to be read to say that Gimenez's new evidence "would be sufficient to establish by clear and convincing evidence that, but for [Gimenez's actual innocence], no reasonable factfinder would have found the applicant guilty of the underlying offense."  As the Eleventh Circuit has recognized, however, it is "inconceivable that a person would be found not guilty 'but for'—or 'except for'—his actual innocence; rather, a person is found not guilty precisely because of his actual innocence."  *In re Davis*, 565 F.3d 810, 823 (11th Cir. 2009).  Even though the statutory language of § 2244(b)(2)(B)(ii) doesn't easily accommodate an actual innocence claim, the Eleventh Circuit held nonetheless that "[t]he statute undeniably requires a petitioner seeking leave to file a second or successive habeas petition to establish actual

---

[46] R&R at 14.

1    innocence by clear and convincing evidence *and* another constitutional violation." *Id.* at 824.

2    The Tenth Circuit has held the same: "In conclusion, the universe of facts that enter into the

3    subparagraph (B)(ii) analysis consists *only* of evidence presented at the time of trial,

4    adjusted for evidence that would have been admitted or excluded 'but for constitutional error'

5    during trial proceedings.  The factual universe does not encompass new facts that became

6    available only after trial and that are not rooted in constitutional errors occurring during trial."

7    *Case v. Hatch*, 731 F.3d 1015, 1038 (10th Cir. 2013).  Because Gimenez's successive

8    habeas claim of actual innocence isn't tethered to a claim of constitutional error, the Court

9    finds that it doesn't pass § 2244(b)(2)(B)(ii). *Id.* at 1037.

10          As with his false testimony claims, however, *even if* the Court accepts that his actual

11   innocence claims survive § 2244(b)(2)(B)(ii), it would still find that Gimenez has failed to

12   establish by clear and convincing evidence that, with allegedly better, more contemporary

13   testimony, no reasonable factfinder would have found him guilty.  The R&R puts the point

14   well.

15              This is not a case where the science upon which Gimenez was
              convicted is now considered 'junk science,' nor is it a case where
16              current scientific methods, such as DNA analysis, definitively
              exclude Gimenez as the agent of Priscilla's death.  Rather, it is
17              a case which involves scientific and medical judgment and a
              forceful debate among experts in the field.  Although medical
18              opinion as to the mechanics of injury in infant head trauma and
              how to diagnose shaken baby syndrome/abusive head trauma
19              has evolved over time, such a diagnosis was not false at the
              time, nor has Gimenez established it is currently false as
20              opposed to simply being a matter of controversy and judgment.[47]

21   Gimenez's objections to the R&R are **OVERRULED**, and the Respondent's motion to

22   dismiss his actual innocence claims is **GRANTED**.

23          **E.    Gimenez's Cumulative Error Claim**

24          Gimenez's remaining claim is a cumulative error claim based on false testimony,

25   ineffective assistance of counsel, and actual innocence.  It is, in essence, the aggregate of

26

27

28
       _____

          [47] R&R at 24.

1   all of his claims, asserted under the Fifth, Sixth, and Fourteenth Amendments.[48]

2       The cumulative error claim can't fail simply because all of its constituent claims have
3   failed.  The entire point of a cumulative error claim is that "although no single trial error
4   examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of
5   multiple errors may still prejudice a defendant." *U.S. v. Frederick*, 78 F.3d 1370, 1381 (9th
6   Cir. 1986).  At the same time, the constituent alleged errors that comprise Gimenez's petition
7   fail not necessarily because they're insufficiently prejudicial, which implies an analysis on the
8   merits, but rather because they don't satisfy §§ 2244(b)(1) and (b)(2)(B) to even be
9   considered in the first instance.  The Court has found that the ineffective assistance claims
10  fail because they were previously presented in an earlier habeas petition, or, in the
11  alternative, because their factual predicates could have been discovered previously because
12  they all relate to some act or omission at trial.  Likewise, it has found that the false testimony
13  and actual innocence claims fail, either because: (1) they are not tethered to an independent
14  claim of constitutional error; (2) Gimenez can't establish that the testimony at issue was
15  actually false; or (3) he cannot establish by clear and convincing evidence that, with the
16  evidence he has today, no reasonable factfinder would find him guilty.  Given that Gimenez's
17  false testimony, ineffective assistance, and actual innocence claims all fail under § 2244(b),
18  his claim of cumulative error must fail as well.  His objection to the R&R is **OVERRULED**,
19  and Respondent's motion to dismiss the claim is **GRANTED**.

20  **IV.   Conclusion**

21      If there is a kernel of merit to Gimenez's habeas petition, it is that a trial *today* for
22  someone accused of shaking a baby to death would go differently than it went in 1992, when
23  he was tried.  We know more today than we knew then, and at least one state court has
24  even ordered a new trial on this basis, equating "the emergence of a legitimate and
25  significant dispute within the medical community as to those injuries [associated with shaken
26  baby syndrome]" to new evidence that establishes a reasonable probability of a different
27  result at trial.  *State v. Edmunds*, 308 Wis.2d 374, 392 (Wis. Ct. App. 2008).

28  _____

[48] Pet. at 9K.

1    But, the question on federal habeas review is not whether a petitioner would have a

2   better shot at an acquittal today than he did when we was tried.  It is whether the state

3   court's adjudication of his claims "(1) resulted in a decision that was contrary to, or involved

4   an unreasonable application of, clearly established Federal law, as determined by the

5   Supreme Court of the United States; or (2) resulted in a decision that was based on an

6   unreasonable determination of the facts in light of the evidence presented in the State court

7   proceeding."  28 U.S.C. § 2254(d).  *See also Murray v. Schriro*, 2014 WL 997716 at *7–8

8   (9th Cir. Mar. 17, 2014) (defining standards under §§ 2254(d)(1) and (2)).

9    The Court doesn't even reach that question here because, as a second, successive

10  habeas petition, Gimenez's petition must satisfy the requirements of 28 U.S.C. § 2244.  It

11  must present claims that haven't been presented before.  28 U.S.C. § 2244(b)(1).  If the

12  claims haven't been presented before, their factual predicates must have been previously

13  undiscoverable through the exercise of due diligence.  28 U.S.C. § 2244(b)(2)(B)(I).  *Even*

14  *then*, "the facts underlying the claim, if proven and viewed in light of the evidence as a whole,

15  [must] be sufficient to establish by clear and convincing evidence that, but for constitutional

16  error, no reasonable factfinder would have found the applicant guilty of the underlying

17  offense."  28 U.S.C. § 2244(b)(2)(B)(ii).  For the reasons the Court has given above, all of

18  Gimenez's habeas claims are lost in § 2244.  None survive to even be considered under §

19  2254(d).

20    That said, the Court has familiarized itself with the record in this case, Gimenez's

21  allegedly new evidence, and the Superior Court's reasoned order denying his state habeas

22  petition.[49]  It sees no basis for federal habeas relief.  The Court agrees with the Superior

23  Court's conclusion that "Petitioner's new evidence regarding SBS theory of injury in the

24  absence of trauma demonstrates the existence of an ongoing debate, not that the entire

25  theory has been refuted or deemed uniformly unreliable."[50]  Regarding its treatment of the

27    [49] The briefing cites the order as Lodgment 1, but the Court finds it in Lodgment 3,
Volume 2, Lodgment 27.

    [50] Lodgment 3, Volume 2, Lodgment 27 at 3.

false evidence claims, the Court doesn't find that it was contrary to or an unreasonable application of Supreme Court precedent, nor does it find that it was an unreasonable determination of the facts.[51]  It concludes the same with respect to the order's treatment of Gimenez's ineffective assistance of counsel claims.[52]

Respondent's motion to dismiss is **GRANTED**.  The Court grants Gimenez a certificate of appealability.  *See* 28 U.S.C. § 2253(c)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  While the Court is confident in its reasoning, there are some issues Gimenez's petition raises that haven't been definitively addressed by the Ninth Circuit, for example: (1) the definition of a "claim" under § 2244(b)(1); (2) the significance of the words "but for constitutional error" in § 2244(b)(2)(B)(ii); and (3) the question whether a freestanding actual innocence claim based on new evidence can be brought in a successive habeas petition governed by § 2244(b)(2)(B)(ii); and (4) whether it is a due process violation to have been convicted on the basis of evidence that wasn't knowingly false to anyone at the time but has since been called into question by advances in scientific or medical understanding.

Finally, Respondent argues that Gimenez's petition is untimely because it was filed more than a year after the factual predicates for his claims became known to him.  The R&R agrees with that argument, concluding his petition was due on November 26, 2009 and that it's not saved by statutory or equitable tolling.[53]  Because the Court has considered Gimenez's petition under both § 2244(b) and § 2254(d), it doesn't reach the timeliness issue.

**IT IS SO ORDERED**.

DATED:  March 27, 2014

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge

---

[51] Lodgment 3, Volume 2, Lodgment 27 at 5–8.

[52] Lodgment 3, Volume 2, Lodgment 27 at 8–13.

[53] R&R at 30–32.

- 24 -